122 Ill. App.3d 868 (1984)
462 N.E.2d 586
AMERICAN NATIONAL BANK & TRUST COMPANY OF CHICAGO et al., Plaintiffs-Appellees,
v.
JOHN P. CARROLL, Indiv. and d/b/a Carroll Builders, Defendant-Appellant (Ziebell Water Service Products, Inc. et al., Defendants).
No. 83-1088.
Illinois Appellate Court  First District (5th Division).
Opinion filed March 16, 1984.
*869 Reuben & Proctor, of Chicago (Edward G. Proctor, Thomas F. Ging, and James R. Daley, of counsel), for appellant.
Kirkland & Ellis, of Chicago (Cornelius J. Harrington, Jr., Frank L. Winter, and James N. Nowacki, of counsel), for appellees.
Judgment affirmed.
JUSTICE WILSON delivered the opinion of the court:
Defendant, John P. Carroll, a land developer and builder, appeals from preliminary and permanent injunctions entered by the trial court enjoining him from tunnelling under plaintiff Fairfield's land in order to connect into water and sewer lines located therein. The issues presented for review are: (1) whether the trial court erred in its interpretation of an ordinance which, when complied with, entitles the village of Olympia Fields to receive certain property easements, and (2) the propriety of the issuance of preliminary and permanent injunctions. For the reasons hereinafter stated, we affirm.
The property involved in this litigation concerns a 112-acre residential development project, "Trails of Olympia Fields," which was constructed by plaintiff Fairfield Service Corporation (Fairfield) located in the village of Olympia Fields, Illinois. Bordered by Vollmer Road along the north, 203d Street on the south, Governors Highway on the west and Kedzie Avenue on the east, the development is subdivided into three sections. Phase 1 in the southern portion of the development project comprises 77 residential lots. Phase 2, located approximately in the middle third, consists of 81 lots of single-family dwellings. Phase 3 in the northern third is undeveloped commercial property.
In 1978, Fairfield applied and was granted permission by the Metropolitan Sanitary District (MSD) to construct sewers in Phase 1. On the application, Fairfield represented that the village was the owner of the sewer system. Sewer construction in Phase 1 was completed in 1979 and in 1981 construction was completed for Phase 2.
Defendant, doing business as Carroll Builders, owned land adjacent *870 (east) and parallel to Fairfield's project. After constructing his own water and sewer lines, defendant prepared to tap into Fairfield's lines to the west by excavating a tunnel under Kedzie Avenue, which divides the parties' properties. Defendant was about to make the connection in February 1983, but before he entered beneath Fairfield's land, Fairfield filed a motion for a temporary injunction, alleging that it had constructed the water and sewer lines at its expense and that easements had not yet been dedicated to the village to permit entry onto the land or use of the lines.
In rebuttal, defendant argued that it had received permission from the MSD as well as the village to tap into these lines. Both Fairfield and defendant agreed, however, that the principal issue before the court was which party had the right to control the lines in question.
Granting the temporary injunction, the trial court reasoned that it should maintain the status quo in order to permit both sides to prepare for full argument on the merits of this cause, which was scheduled to be heard in April 1983.
In the interim, on March 9, 1983, the village president requested that the village engineer, Edward J. Resner, conduct a "second inspection" of the sewer line in Phase 2 in accordance with village ordinance 17W, section 3(H), which provides that a second inspection of water and sewer lines in a development project be completed prior to the village's acceptance of the lines and concomitant conveyance from the developer to the village of easements for access for maintenance and repair.
Resner complied with this request on the morning of March 14, 1983, and informed the village president that afternoon that he had inspected portions of Fairfield's sewer system. Resner recommended that certain segments of the sewer lines be accepted by the village board, which it did at its board meeting that evening.
The following week, on March 21, 1983, the village attorney wrote a letter to Fairfield's counsel, Cornelius J. Harrington, requesting that in accordance with ordinance 17W, Fairfield immediately convey to the village the necessary easements for the sewer line in Phase 2. This request was denied. On March 28, 1983, the village board passed a resolution accepting the water lines and the Phase 1 development project.
Injunctive proceedings before the trial court commenced April 14, 1983. First, defendant presented a motion to dismiss, asserting that the court did not have equity jurisdiction over this matter because Fairfield had not shown irreparable harm and had an adequate remedy *871 at law (damages). Fairfield's primary motive, defendant alleged, was to destroy defendant's development project by making it impossible for defendant to sell homes in the spring season because he (defendant) would not have access to any water or sewer lines. Also, defendant urged, the water and sewer systems now belong to the village and, further, Fairfield's land development in Phase 2 was already burdened with a utility easement used by Northern Illinois Gas Company.
Following Fairfield's argument in rebuttal that the village board proceedings were a "hurry up operation between [defendant] and the Village Engineer," the court recessed and subsequently issued a ruling denying defendant's motion.
Fairfield then called defendant to testify as an adverse witness pursuant to section 2-1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2-1102). Defendant stated that Fairfield's counsel, Cornelius J. Harrington, had briefly informed him in August 1982 that there was "a problem between [defendant] and Fairfield" which had to be resolved. Defendant then read into evidence a letter from Resner, the village engineer who had performed a second inspection of Fairfield's sewer lines in March and who also worked for Wight Engineering Company. Fairfield had hired Wight to work on its project. The letter was addressed to the village commissioner and requested a building permit for defendant, but "subject to [defendant's] satisfactory submission of a sanitary sewer easement on the west side of Kedzie Avenue for the sewer he is connecting into." It went on to state that "the easement should be recorded prior to occupancy of any units."
Defendant further testified that as of October 1982, he had not obtained an easement from anyone. In February 1983, defendant telephoned Resner but did not recall whether Resner had advised defendant to obtain an easement to tap into plaintiff's water and sewer lines. Part of the conversation with Resner did concern Fairfield's "No Trespassing" signs, however. Defendant stated that he had telephoned Resner because defendant believed that he (defendant) had a written permit to tap in. This permit, Fairfield's exhibit 2, was entitled "Metropolitan Sanitary District, Sewage System Permit 82-241."
Testifying further, defendant acknowledged that he never asked Fairfield for an easement and that in spite of the October 1982 letter he dug a pit in February 1983 to connect to plaintiff's water and sewer lines.
Fairfield next examined William V. Briody, who stated that as project *872 director at Fairfield Service Corporation he was responsible for the management of the "Trails of Olympia Fields" development project. His duties included working with engineers, obtaining permits and approvals from the village, the MSD, Cook County and the Illinois Environmental Protection Agency as well as soliciting and awarding bids. Briody explained that for marketing and economic purposes this project was divided into three phases and had been paid for by Fairfield. The engineering firm of Wight and Company had designed the sewer and water lines in Phase 1 which were constructed in 1980. Sewer, water and storm sewer lines in Phase 2 were completed in 1981. There had not as yet been any residential development in Phase 3.
Testifying further, Briody said that it was after the water and sewer lines were constructed that he learned that they had been built in such a manner as to be able to serve areas other than the property owned by Fairfield. Briody also identified Fairfield's exhibit 13, which was its request for final inspection and approval of Phase 2. After identifying several additional exhibits, Briody was examined concerning his letter to Anton Medovich, chief field engineer at Wight and Company, dated August 17, 1982. The letter requested an inspection of Phase 2 but only to "ascertain substantial completion on the part of the Contractor so final payment can be made to him." Briody stated that pursuant to this request he participated in the inspection of the site improvements, including the water and sewer lines.
Briody stated that on February 14, 1983 he noticed that defendant had begun to dig a pit which would enable it to tunnel under Kedzie Avenue in order to tap into Fairfield's water and sewer lines. Briody immediately called Fairfield's attorneys, installed three "No Trespassing" signs and photographed the area. That same day, Briody talked to one of the men on defendant's construction site and informed him that Fairfield had not granted defendant an easement to enter onto the property and that Fairfield would take legal action to prevent defendant from doing so.
Briody testified further that defendant had never asked for permission to tap into Fairfield's lines nor did he receive notice from the village or from Wight and Company that they intended to inspect any portion of the Phase 2 project. Briody was also not informed that there would be a village board meeting regarding Fairfield's water and sewer lines.
Briody then stated that Fairfield had entered into an agreement with another company whereby the company agreed to extend Fairfield's sewer line in order to tie into it. The company completely paid *873 for this construction work. Fairfield in turn granted the company an easement to connect into the lines. Defendant had never approached Fairfield to discuss whether such an agreement could be arranged, Briody said.
On cross-examination Briody identified a document entitled Request For Final Inspection, Phase 2, dated February 23, 1981. Although Briody had signed the document which stated that he certified that the project had been completed to his satisfaction, he said that his primary contention now was that he had not been notified prior to the second inspection which occurred on March 14, 1983.
Fairfield next examined Edward J. Resner, village engineer and chief engineer at Wight and Company. Resner stated that Wight had designed the water and sewer system for Fairfield's development projects in Phases 1, 2 and 3.
Resner stated that he received a call from defendant in January or February 1983 advising him that defendant "was not having any success in dealing with plaintiff in obtaining the ability to tap into a sewer and water line." Resner responded that it was a legal question and that defendant should contact the village attorney. On February 14 defendant again called and said that he (defendant) was attempting to augur a sewer line to Fairfield's property but had ceased to do so because of Fairfield's "No Trespassing" signs. Resner advised Fairfield to resolve the dispute of obtaining an easement to connect into the sewer and water facilities although he did not tell defendant to call anyone in particular.
Resner received a letter from the village attorney on March 9 requesting that he inspect the sewer lines on Fairfield's property. In compliance, on March 14, Resner examined the engineering drawings of the project and inspected one of the four manholes on the sewer line to which defendant sought to connect. Although the area where the water mains were installed were "observed," no tests were conducted. That same day Resner recommended in a hand-delivered letter to the village trustees that the village accept only that portion of the sewer and water lines in Fairfield's project to which defendant sought to connect. That evening, at the village board meeting, Resner made a presentation about the inspection of Fairfield's lines, which inspection had been conducted by him, along with Fred Keech, the director of public works and Anton Medovich, the chief field inspector.
Resner denied that he had said at the meeting that an additional "walk through" inspection was necessary and stated that he had personally made the decision not to inspect the sewer and water lines in the other portion of the Phase 2 development project. In his opinion, *874 however, another final inspection was necessary for the interior sanitary sewer lines before Fairfield could operate any of the sewer lines which would service any of the lots in Phase 2. No further inspection was required for defendant to be able to utilize the portion of the water and sewer line to which defendant seeks to connect, however.
As far as Fairfield's water line was concerned, Resner testified that he stated in a letter to the village president that pressure testing and chlorination records should be established before the village accepted the line as a public improvement.
Testifying further, Resner stated that his inspection took approximately 30 to 45 minutes, that he did not make any notes and did not inform or give notice to Fairfield or its attorneys that an inspection would occur or that a village meeting would take place that day. Resner then explained that an observation of a construction project is a cursory review of the intentions of the design documents with respect to the actual installation of an improvement. An inspection, on the other hand, requires a higher degree of investigation which is performed often on a full-time basis when the contractor is actually installing the improvement. Attention is given to the original specifications.
Under cross-examination, Resner stated that he had inspected defendant's adjacent property only once, on or about October 1982. He also said that he had only recommended a portion of Fairfield's sewer and water lines in Phase 2 for acceptance but that he had recommended partial acceptance of water and sewer systems in the past. Further inspections of Fairfield's as well as defendant's interior lines would be required before they could be put to use. Thus, although Resner approved the plans for the tap-in, defendant would not be able to put the tap-in to use until after a further inspection of the interior lines. Resner then identified a permit issued to defendant for the construction of his sanitary system by the MSD which he signed as municipal engineer and as the inspection engineer. At the close of Resner's testimony on re-cross-examination, defendant submitted a motion for a directed verdict, which was denied.
Defendant then presented his case in rebuttal and first submitted a number of exhibits into evidence, including Fairfield's sewerage system permits for Phase 1 and Phase 2, issued by the MSD. Under a category entitled "Schedule A  Basic Information," both permits identified the village of Olympia Fields as the owner "of all sewer systems from [the] project to [the] MSDGC [Metropolitan Sanitary District of Greater Chicago] interceptor." Defendant's sewerage permit from the MSD for its construction project also identified the village as the *875 owner. Also admitted was defendant's application for a highway permit which was signed and approved by the Cook County superintendent of highways which granted to defendant the authority "to install, operate and maintain a 10 inch water main and valve vault running under and across Kedzie Avenue."
Next, defendant called his first witness, James Creswell, village attorney of the village of Olympia Fields. Creswell testified that on March 21, 1983, he sent a letter to Fairfield's attorney on behalf of the village requesting that Fairfield deliver to the village the easements for its sewer line. A second letter followed on April 6. On April 11 a motion was made and passed by the village board to clear up any questions as to the March 14 board meeting regarding the sewer and water lines in Phase 1.
Testifying further, Creswell stated that the village had a tap-in ordinance in the general building codes and that any fees generated from a tap-in would go to the village.
Next to testify was Anton Medovich, chief field engineer inspector for Wight and Company. Medovich stated that he performed periodic inspections in Phase 2 of the construction of the roads, public utilities and sewer and water lines. In 1980 Medovich approved and signed Fairfield's request for final inspection of the sewer lines in Phase 2.
Medovich stated that on March 14, 1983, he, Resner and Fred Keith, director of public works for the village performed an inspection of the sewer lines along Kedzie Avenue in Phase 2 and did not find any deficiencies. He stated under cross-examination that all of the inspections he performed on Phase 2 were for Fairfield with the exception of the March 14 inspection which was conducted at the request of his supervisor, Resner. He also testified that he was acting in his capacity of providing services for Fairfield when he signed Fairfield's request for final inspection and approval of Phase 2. His periodic inspections were basically conducted to insure that the project was proceeding according to construction plans and specifications.
Defendant next called William Briody, who testified that he had been misled by his engineers who installed oversized sewer and water pipes along Kedzie Avenue that would accommodate more capacity than what was required. It was because of the overcapacity that Fairfield was able to negotiate an agreement with another company in its Phase 3 project, Briody stated. When Briody learned of defendant's intentions to connect to Fairfield's sewer he spoke to defendant approximately three times between June 1982 and February 13, 1983.
Defendant Carroll testified next. Currently the beneficial owner of his development project, defendant once owned the entire tract of *876 land which includes Fairfield's property as well. Fairfield purchased its land from defendant in 1977.
Defendant said that in January 1982 he submitted engineering drawings for his construction work to the village for their review and approval as well as to the MSD, the Illinois EPA and the State highway department who each gave their approval. Defendant testified that he "tried to alert people to the fact that he was attempting to tap into Fairfield's sewer line but it wasn't until Fairfield placed "No Trespassing" signs on its property that defendant said he first became aware of Fairfield's opposition to defendant's plans.
Testifying further, defendant stated that there could possibly be a sewer connection somewhere else but that the tap in on Fairfield's property would be the most logical, direct and useful. The procedure that defendant intended to use, if permitted, was to augur under Kedzie Avenue with "little disturbance on the other side."
Defendant testified under cross-examination that Phase 1 of his development project began in May or June of 1982 and included construction of water lines. Defendant stated that when he first became aware in 1981 that Fairfield had constructed sewer and water lines along Kedzie Avenue he talked to the director of public works of the village who informed defendant that as far as he knew defendant could tie into Fairfield's lines.
Continuing his testimony under cross-examination, defendant admitted that in October 1982 his attorney informed him that Robert Field, a village trustee, had said that there was a "question" about using the sewer on Kedzie Avenue if it had not been dedicated to the public. Defendant had also received notice from the village that he had to settle his dispute with Fairfield concerning the cost of constructing a public sidewalk.
Redirect examination disclosed that defendant believed that since he had building permits and approvals from the village, EPA, MSD and the county highway department and since Fairfield's line had previously been tapped into, he thought that he could do the same. After stressing the financial hardship and imposition that this cause of action had created, defendant rested his case.
In rebuttal, Fairfield called Cornelius J. Harrington, one of its attorneys who had previously testified. Harrington stated that following the adjournment of the village meeting on August 9, 1982, he told defendant, who was present, that he (Harrington) understood that defendant had plans to tie into Fairfield's sewer and water lines, that Fairfield had never recorded the plat of subdivision of Phase 2 and that Fairfield would object if defendant attempted to tie into those *877 lines. Following this testimony, Fairfield rested its case. Defendant rested his case in surrebuttal following brief testimony by his son.
After closing arguments by both sides, the court entered its judgment in favor of Fairfield, holding that the inspection by the village engineer (Resner), and approval of only part of Fairfield's lines failed to satisfy village ordinance 17W, section 3(H), which requires a second inspection of all lines as a mandatory precondition to acceptance by the village board. Defendant now appeals.

OPINION
Initially, defendant contends that for several reasons the trial court misinterpreted the provisions of ordinance 17W section 3(H), which provides as follows:
"Developer shall install all sanitary sewer, storm and water lines as necessary to serve the improvements under construction. All stages of construction shall be subject to inspection and approval by the Village Engineer. The Developer shall maintain all lines for one (1) year after said approval. After the end of the one year period, a second inspection shall be made of all lines by the Village Engineer, and if said lines are approved, they shall be submitted for final acceptance by the Village Board. Upon acceptance of any lines by the Village Board, Developer shall convey to the Village easements necessary for access for maintenance and repairs of said lines. The Village, after final acceptance of any lines, shall operate, maintain and repair said lines as part of the Village system, but shall not be responsible for restoration of any landscaping or amenities placed over lines or be in any manner responsible for any damage direct or consequential because of malfunction of any of such systems, except for damage caused by the negligence of the Village."
First, defendant contends that the ordinance does not require that all public improvements in a subdivision be accepted by the village board at the same time. The key language in section 3(H) in this regard, defendant posits, is that "upon acceptance of any lines by the Village Board, * * *" the developer shall convey to the village the necessary easements and that "* * * the Village, after final acceptance of any lines, shall operate, maintain, and repair said lines as part of the Village system." Defendant further contends that Resner testified that municipalities occasionally accept only portions of water and sewer lines. Also, the subject of partial acceptance was discussed at the village board meeting on March 14 where it was voted to accept a *878 portion of the sewer lines along Kedzie Avenue.
It is our view that defendant misinterprets the trial court's ruling. In reaching its decision that the village had not complied with the requirements of the ordinance, the court focused in part on Resner's inspection, which it found was defective. The fact that section 3(H) provides that the village may accept any lines was not found to be an impediment to the village's decision to accept Fairfield's water and sewer lines. Rather, the record discloses that the court specifically stated that the village had, in fact, "* * * formally accepted that part of the sewer line running parallel to Kedzie Avenue and part of Phase 1 of plaintiff's development." The court then went on to state that the village had not exercised any control over that part of the sewer line contained in Phase 2 and therefore had not accepted it. The one year maintenance period referred to in section 3(H) is triggered by the village engineer's approval of all the sewer lines in the improvement, the court observed, followed by a second inspection of all lines.
 1 Thus, although section 3(H) states that the village may accept any lines in a development, the village engineer initially must inspect and approve all lines prior to submitting them for final acceptance. The facts disclose, however, that Resner stated on direct examination that in his opinion, another final inspection was necessary for Fairfield's interior sanitary sewer lines before they could be used. Additionally, although Resner stated that he had personally made the decision not to inspect the sewer and water lines in another portion of the Phase 2 development project, this decision contravened the specific language of section 3(H), which requires a second inspection of all lines. Because this was not done, as the trial court properly ruled, the board's acceptance of Fairfield's lines on March 14 was ineffective.
Next, defendant argues that the inspectional requirements of section 3(H) were fully met because there were two inspections of Fairfield's water and sewer lines in Phase 2, the first of which occurred in 1980 when Robert Richter, the village engineer at the time, and Gerald Louis Maullin,[1] the inspection engineer, both certified their approval of the lines in Phase 2 by signing Fairfield's request for final inspection, which indicated that the lines were periodically inspected. The second inspection occurred on March 14, 1983, defendant contends, when Resner conducted an inspection at the direction of the village president. Phase 2 water lines were accepted by the board on April 11, 1983.
*879 Fairfield, on the other hand, counters that section 3(H) specifically requires that all lines be inspected. Contrary to defendant's postulation, Fairfield asserts, Resner perfunctorily performed what can best be described as an "observation" of the sewer line and did not inspect the water line at all.
Without addressing the propriety of the alleged first inspection of Phase 2, the trial court ruled, as we have previously stated, that all lines in Phase 2 had not been inspected and approved on March 14, 1983, which deficiency rendered the village board's subsequent vote to accept the lines ineffective. Again, we concur with this conclusion. In our judgment, Resner's testimony set forth above strongly suggests that the purported final inspection of the lines in Phase 2 was incomplete and possibly premature since the lines were not yet operative. Moreover, Resner said that he had informed the village that pressure testing and chlorination records should be established before Fairfield's water line was accepted as a public improvement. We are aware that section 3(H) does not delineate guidelines for conducting a "first" inspection and merely states that the second inspection should be made after the developer has maintained all lines for one year following an initial approval by the village engineer. We are convinced, however, that the plain and ordinary meaning of this language supports Fairfield's view that the final inspection in this case was inadequate. (Fess v. Parke, Davis & Co. (1983), 113 Ill. App.3d 133, 135, 446 N.E.2d 1255. See also Tisoncik v. Szczepankiewicz (1983), 113 Ill. App.3d 240, 245, 446 N.E.2d 1271, where we determined that in construing a statutory provision which has not yet been judicially interpreted, a court is guided by both the plain meaning of the language of the statute as well as legislative intent.) Indeed, section 3(H) suggests that a second inspection occur after all lines are operative. We therefore disagree with defendant's contention on this issue.
 2 Further challenging the proceedings before the trial court, defendant asserts that Fairfield's cause of action should have been dismissed at the outset because it was an impermissible collateral attack on village ordinance 17W. In this regard defendant posits that Fairfield's complaint was a quo warranto proceeding which, as a direct action, may not be raised collaterally. We cannot agree with this contention.
Our review of Fairfield's complaint reveals that Fairfield characterized defendant's anticipated entry onto its property as an impending trespass, stating that a controversy existed as to whether defendant had the right to connect into Fairfield's water and sewer lines (Count 1). Count 2 urged the court to issue a declaratory judgment *880 and injunctive relief. Fairfield's motion for a preliminary injunction was filed the following day.
Additionally, we note that defendant's cases cited on this issue are inapposite to the facts before us. In Village of Bridgeview v. City of Hickory Hills (1971), 1 Ill. App.3d 931, 274 N.E.2d 925, the question presented for review concerned the propriety of quo warranto proceedings instituted by the State's Attorney of Cook County, who challenged the village of Bridgeview's decision to annex contiguous land. A similar issue (the disconnection of property which had previously been annexed) was raised in North Main Fire Protection District v. Village of Niles (1977), 53 Ill. App.3d 389, 368 N.E.2d 516. The questions presented in these decisions, however, are not before us in the pending matter.
 3 Defendant's final argument on appeal is that the trial court erroneously granted injunctive relief in the absence of any evidence that Fairfield did not have an adequate remedy at law and was irreparably harmed. Defendant contends further that the trial court also improperly refused to balance the equities between Fairfield and defendant. Again, we cannot agree.
A preliminary injunction is an extraordinary provisional remedy granted before the hearing of a case on its merits in order to preserve the status quo for the purpose of preventing a threatened wrong or any further perpetration of an injury. (21A Ill. L. & Prac. Injunctions sec. 4 (1977).) Such an injunction does not decide controverted facts or the merits of the cause; rather, it only shows that sufficient cause has been made to authorize or require the court to preserve the rights in issue until a final hearing on the merits. (Duval v. Severson (1973), 15 Ill. App.3d 634, 641, 304 N.E.2d 747.) An applicant is not entitled to a temporary injunction as a matter of right; he must show (1) that it is clear that he has a lawful right for which he seeks protection; (2) that he will be irreparably harmed and (3) that his remedies at law are inadequate. Kaplan v. Kaplan (1981), 98 Ill. App.3d 136, 141, 423 N.E.2d 1253.
In the case at bar, Fairfield's two-count complaint alleged that it had been "* * * informed and believe[s] that [defendant] desires to connect its water and sewer lines * * * into the water and sewer lines already constructed and owned by Fairfield and located immediately west of Kedzie Avenue." The complaint further enumerated the ways in which Fairfield attempted to place defendant on notice that such entry would constitute a "forcible unlawful and wrongful trespass" and it stated further than an actual controversy existed as to whether defendant had the right to enter upon or under Fairfield's property.
*881 In response, defendant's answer acknowledged that the property belonged to Fairfield but alleged that defendant's intentions were to lawfully tap into the sewer and water facilities "through an easement [granted] to the Village of Olympia Fields for access to the Village's water and sewer lines * * *." Defendant admitted that a controversy existed but denied that Fairfield owned the lines in question.
Based on these facts, the trial court did not abuse its discretion in issuing injunctive relief. Rather, our review convinces us that the court exercised the proper caution in granting the injunction; it identified the controlling issue presented, heard argument by counsel for both sides and received supporting evidence as to the ownership of the property in question. It was Fairfield, however, who was ultimately successful in demonstrating that there was a clear or immediate necessity to maintain the status quo because of a threatened actual and substantial injury. We believe that the trial court's findings are well supported by the evidence and therefore conclude that the preliminary injunction was properly granted. Summit Electric Co. v. Mayrent (1974), 17 Ill. App.3d 545, 550, 308 N.E.2d 313.
 4 We turn now to the propriety of the issuance of the permanent injunction. A permanent injunction is designed to extend or maintain the status quo indefinitely after a hearing on the merits where it has been shown that the plaintiff is suffering irreparable harm and there is no adequate remedy at law. ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc. (1980), 90 Ill. App.3d 817, 833, 413 N.E.2d 1299.
In the pending matter, the trial court made several findings, one of which was that the village board's acceptance of the sewer and water lines was ineffective because the requirements of section 3(H) had not been met. The threatened injury Fairfield complained of, which was an unlawful trespass onto its land in order to tap into its lines, could not be measured and corrected by an award of money damages alone as defendant's act would result in a continuing trespass and would cause irremediable injury. It has been previously held that in such situations, injunctive relief is warranted. Pliske v. Yuskis (1980), 83 Ill. App.3d 89, 95, 403 N.E.2d 710.
Accordingly, for all of the foregoing reasons, the trial court's judgment will be affirmed.
Affirmed.
MEJDA, P.J., and LORENZ, J., concur.
NOTES
[1] We are unsure of the correct spelling of this name since it appears as a signature of Fairfield's request for final inspection.