| NOTICE |
| --- |
| Decision filed 03/09/06. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same. |

NO. 5-05-0038

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
| --- | --- | --- |
| EAGLE MARINE INDUSTRIES, INC., RIVER CITY LANDSCAPE SUPPLY, INC., and CONAGRA FOODS, INC., d/b/a PEAVEY COMPANY, | ) ) ) ) | Appeal from the Circuit Court of St. Clair County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 03-CH-1040 |
| UNION PACIFIC RAILROAD COMPANY, | ) ) | Honorable Richard A. Aguirre, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

JUSTICE DONOVAN delivered the opinion of the court:

The circuit court of St. Clair County entered an order enjoining defendant, Union Pacific Railroad Company (Union Pacific), from obstructing a grade crossing located on Monsanto Avenue, a public road in Sauget, Illinois, for more than 10 minutes in accordance with section 18c-7402(1)(b) of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/18c-7402(1)(b) (West 2002)). On appeal, Union Pacific contends that the circuit court erred in entering the injunction because (1) plaintiffs do not have a private right of action under section 18c-7402(1)(b) of the Vehicle Code, (2) the action is preempted by the Federal Railroad Safety Authorization Act of 1994 (49 U.S.C. §§20101 through 20153 (2000)), the ICC Termination Act of 1995 (49 U.S.C. §§10101 through 16106 (2000)), and the commerce clause of the United States Constitution (U.S. Const., art. I, §8, cl. 3), and (3) plaintiffs failed to produce sufficient evidence to establish the essential elements for a permanent injunction.

I. Factual and Procedural Background

1

On November 14, 2003, Eagle Marine Industries, Inc. (Eagle Marine), River City Landscape Supply, Inc. (River City), and ConAgra Foods, Inc., doing business as Peavey Company (Peavey), filed an action in the St. Clair County circuit court seeking to enjoin Union Pacific from stopping its trains in the crossing at Monsanto Avenue in Sauget, Illinois, and thereby obstructing a public road for more than 10 minutes in violation of section 18c-7402(1)(b) of the Vehicle Code. Plaintiffs alleged that Monsanto Avenue provides the only means to get to and from their business facilities, that Union Pacific's trains often block Monsanto Avenue to motor vehicles for 15 to 45 minutes, that the repeated obstruction of Monsanto Avenue deprives plaintiffs of the right to use their properties and compromises public health and safety, and that they have sustained irreparable harm and have no adequate remedy at law.

Union Pacific moved to dismiss the complaint pursuant to section 2-619 of the Illinois Code of Civil Procedure (735 ILCS 5/2-619 (West 2002)). It claimed that plaintiffs do not have a private right of action under section 18c-7402(1)(b) of the Vehicle Code and that plaintiffs' action is preempted by the Federal Railroad Safety Authorization Act of 1994 (49 U.S.C. §§20101 through 20153 (2000)), the ICC Termination Act of 1995 (49 U.S.C. §§10101 through 16106 (2000)), and the commerce clause of the United States Constitution (U.S. Const., art. I, §8, cl. 3). Following a hearing on December 29, 2003, the circuit court denied Union Pacific's motion to dismiss and granted a preliminary injunction. The court directed Union Pacific to refrain from obstructing the Monsanto Avenue crossing for a time period greater than 10 minutes, in accordance with section 18c-7402(1)(b) of the Vehicle Code. An evidentiary hearing regarding the permanent injunction was held on October 18, 2004. During that hearing, the court heard from a number of witnesses. Much of that testimony consists of background information regarding the parties and their respective business operations. The testimony of the witnesses is largely uncontested and often redundant. However, the information is important to an understanding of the case. In an effort to reduce the repetition, we will set forth the uncontested information without attribution to any particular witness,

2

except where necessary to an understanding of the case, and then recount the testimony regarding the subjects of disagreement.

Eagle Marine, River City, and Peavey conduct business and operate facilities along the eastern shore of the Mississippi River in Sauget, Illinois. Their facilities are located west of the Monsanto Avenue crossing and are accessed by means of Monsanto Avenue. Eagle Marine is in the barge transportation business and provides fleeting facilities to companies in St. Louis, Missouri. Eagle Marine also leases land that it owns along the riverfront to other businesses, including River City and Peavey.

Peavey operates a grain-and-bulk terminal that is located just south of Eagle Marine. Peavey buys grain from local farmers and area grain elevators. The sellers truck the grain to Peavey's facility. Peavey then loads the grain onto outbound barges. Peavey also unloads fertilizer and landscape materials from inbound barges. The material is shipped from Peavey's facility by commercial truck. During the harvest season, Peavey's truck traffic count exceeds 1,000 trucks per week. Peavey employs 30 to 40 people, depending on the season. River City's facility lies south of the Peavey facility. River City is a wholesale supplier of bagged and bulk landscape products. It does business with retailers and nurseries in eight midwestern states. River City employs between 45 and 75 employees depending on the season. In the spring, 150 flatbed trucks run in and out of its facility. Eagle Fabrication, a subsidiary of Eagle Marine, has a facility south of River City. Eagle Fabrication manufactures steel products, including decks and barges for the marine industry. It employs 10 to 15 people.

Union Pacific owns and controls the tracks that cross Monsanto Avenue just west of Route 3 in Sauget, Illinois. Union Pacific utilizes the Monsanto Avenue crossing when it transports coal from mines in western states to one of its customers, Cahokia Marine Services (Cahokia Marine). Cahokia Marine is a coal-unloading operation situated on the east shore of the Mississippi River, just north of Eagle Marine's industrial complex. Coal and other products are delivered to Cahokia

3

Marine by unit trains. Union Pacific's trains consist of 134 cars. Other rail carriers that deliver products to Cahokia Marine use unit trains consisting of 105 cars. Union Pacific uses the longer train to reduce the cost to the ultimate purchaser. In making deliveries to Cahokia Marine, Union Pacific's trains cross Monsanto Avenue. The rail cars are then dropped at a spur track called the Towson Main; a spur track is a holding track where the railroad cars are parked. Cahokia Marine has its own locomotives that it uses to pull the coal-filled cars, in 17-car increments, from the Towson Main to its facility.

Originally, the Towson Main was a single-track spur. When Cahokia Marine expanded its facility, it added a second spur. The original spur holds 100 cars and a locomotive. The new spur holds 105 cars and a locomotive. Neither can accommodate a 134-car train. Consequently, some of the "overflow" cars stand in the crossing and block traffic until a crew cuts the train.

The Monsanto Avenue crossing is also blocked while the train crew reassembles an outbound train. During the process, crew members couple the empty cars to the locomotive and then pump air through the train line in order to release the brakes from the wheels. An initial terminal air-brake test is then conducted. A qualified car inspector checks the cars as the brakes are applied and then again as the brakes are released. Tim Herren, the director of terminal operations for Union Pacific's St. Louis region, testified that Federal Railroad Administration regulations state that the air-brake test should be performed before the train is moved from the terminal.

Plaintiffs contend that Monsanto Avenue provides the only practical means of getting to and from plaintiffs' facilities. Union Pacific argued that there is another road called Hog Haven Road that provides an alternate source of access to plaintiffs' facilities. According to the record, Hog Haven Road connects with Route 3 and runs beyond the southern end of plaintiffs' property. By all accounts, Hog Haven Road is a dirt-and-cinder road that has not been maintained and is in poor condition. Parts of the road are impassable after it rains. The evidence in the record clearly establishes that the current condition of the road makes it unsafe for emergency responders and daily

4

traffic and that the road would require numerous structural improvements to enable it to support daily industrial traffic. In addition, a stoplight and a ramp would have to be installed where Hog Haven Road meets Route 3. It is estimated that the total cost of improvements would exceed $2 million.

The seeds of the crossing conflict were planted when Cahokia Marine expanded its operations. Cahokia Marine's increase in business was accompanied by an increase in coal deliveries by rail and more frequent incidents of Union Pacific trains blocking Monsanto Avenue for extended periods of time. Flatbed trucks and vans that regularly transported goods to and from Peavey's and River City's facilities began to experience lengthy delays at the crossing. Frustrated truckers and local farmers who are paid by the load began to complain. Some elected to bypass plaintiffs' facilities and to deliver to nearby competitors rather than wait an indeterminate period of time for the crossing to clear. Many of the workers employed by plaintiffs complained that they were being delayed in getting to work and returning from lunch because Monsanto Avenue was blocked by a stopped train. Hourly employees were losing pay because they were off the clock. Salaried personnel also complained about the increasing delays.

Plaintiffs contacted Cahokia Marine and Union Pacific to voice their concerns regarding the length of time the trains were blocking Monsanto Avenue. Union Pacific did not acknowledge plaintiffs' complaints. In August 2003, plaintiffs contacted the mayor of Sauget for assistance. Mayor Paul Sauget met with plaintiffs and Tim Herren, the director of terminal operations for Union Pacific, on August 19, 2003, and encouraged the parties to confer and negotiate. A follow-up meeting was held in late September 2003. The parties are at odds over what occurred during the meetings and whether anything was achieved.

Richard Burke, the president of Eagle Marine, attended both meetings. Burke testified that he has been the president of Eagle Marine for 15 years and that Eagle Marine has been operating in Sauget since the early 1960s. Burke stated that the problem with stopped trains blocking Monsanto

5

Avenue for more than 10 minutes had been smoldering over the previous few years. During the initial meeting, Burke proposed better communication between the businesses and the railroad as a means to reduce the problems posed by the blocked crossing. Burke asked Tim Herren whether Union Pacific could provide some notice of the time its trains would arrive at the crossing. If so, Eagle Marine and its tenants could attempt to coordinate a delivery schedule with their customers. He asked whether Union Pacific could possibly break its trains and hold some of the cars at a spur north of the crossing. Burke also inquired into the feasibility of extending the Towson Main to accommodate the longer trains. Burke testified that Union Pacific indicated that it would explore a number of options, but it offered no specific ideas or solutions during either meeting.

Burke testified that there was an actual increase in the incidents of stopped trains obstructing the crossing for a period of time following their meetings. Burke stated that he had been delayed at least five times for anywhere from 10 minutes to 45 or 50 minutes and that he had observed occasions where others were delayed for more than 10 minutes. Burke noted some improvement in the situation after the temporary injunction was issued. He noticed that Union Pacific had stationed a supervisor at the crossing to monitor the trains' movements. On a few occasions when traffic had been obstructed by a stopped train for more than 10 minutes, he contacted the supervisor and the supervisor ordered the crew to clear the crossing.

Tim Thomas, the vice president of Eagle Marine and the president of River City, testified for plaintiffs. His testimony was consistent with Burke's testimony. Thomas testified that he had advised Tim Herren, prior to and during the initial meeting, that the obstruction of the Monsanto Avenue crossing for more than 10 minutes by stopped trains was causing economic harm to Eagle Marine and its tenants and that it posed potential risks to the health and safety of the employees and the general public. Herren indicated that he understood plaintiffs' concerns and promised that he would explore a number of options to remedy the problems. Thomas testified that he tried to contact Herren several times after the second meeting regarding the continued problem of the blocked

6

crossing but that Herren never returned his calls.

Ray Keating, the manager for Peavey, testified that he wrote to Tim Herren and to Dan Gerovac, the manager of Cahokia Marine, to request their assistance in resolving the problem of the blocked crossing. He also attended both meetings. Keating stated that plaintiffs offered a number of suggestions during the meetings but that Union Pacific never responded to them. Keating testified that Peavey's business was being harmed by repeated instances where the crossing was blocked for an extended time. He said that the blocked crossing discourages Peavey's customers from using its facilities, disrupts its abilities to load and unload barges efficiently, and delays its employees from getting to work and to meetings outside the facility.

Patrick Delaney has been the police chief of the Village of Sauget since 1984. Chief Delaney said that the conflict regarding trains blocking Monsanto Avenue had developed over the previous few years. He stated that blocking Monsanto Avenue for an indeterminate time creates traffic congestion and impedes emergency response. He also stated that Hog Haven Road was unsuitable for fire trucks and ambulances to travel. Chief Delaney recalled occasions when Monsanto Avenue was blocked for so long that traffic backed up to Route 3. He recounted an instance when a recovery team that was continuing its mission to search for the body of a Peavey employee who had fallen into the Mississippi River was delayed for 40 minutes because the Monsanto Avenue crossing was blocked by a train. His department has received numerous complaints about trains blocking the crossing. Chief Delaney stated that there were times when he had directed his officers to order Union Pacific crews to clear the crossing and that Union Pacific complied with the orders. His department has never issued a citation to Union Pacific for blocking the Monsanto Avenue crossing.

Union Pacific called John Baricevic as a witness. Baricevic testified that he was serving his fourteenth year as St. Clair County board chairman and that during his tenure he has dealt with several complaints of blocked crossings. When he receives those complaints, his primary concern is public safety. He first determines whether there is an alternate route for emergency responders.

7

When there is no alternate route, the county asks the rail carrier to cooperate with emergency personnel and to clear the crossing when requested. Should that approach fail, the state police would be dispatched to determine whether a ticket summons should be issued. Baricevic stated that he could only recall one rail carrier who declined to cooperate, but the carrier reconsidered after it had been fined a few times. Baricevic opined that the provision allowing the imposition of fines for violations of the antiblocking statute deters rail carriers from blocking a crossing for an unreasonable period of time and is an effective remedy. Baricevic also opined that Hog Haven Road provided an alternate route to access plaintiffs' facilities. During cross-examination, Baricevic testified that his opinion was based on his review of county maps indicating that the road was still there and open. He admitted that he had not been on the road in more than a year and that during his last trip, he was a passenger in a four-wheel-drive vehicle, they drove at a low speed, and the road was "passable" at that time.

Dan Gerovac, the general manager of Cahokia Marine, attended the second meeting at the village hall. Gerovac testified that during the meeting Tim Herren advised plaintiffs that Union Pacific intended to assign supervisors to spot its trains and to direct the crews to cut them and move them out of the Monsanto Avenue crossing as quickly as possible. Gerovac felt that this action would be helpful because it would lead to a reduction in the time that trains stand in the crossing. He also noted that a supervisor would be immediately available to provide direction if the crossing was blocked due to an equipment problem. Gerovac testified that an injunction barring Union Pacific trains from servicing its facility would devastate its business.

Tim Herren, the director of terminal operations, testified that he represented Union Pacific at both meetings. During the first meeting plaintiffs told him how the blocked crossing was adversely impacting their businesses. Herren stated that he listened to their suggestions and then explained that Union Pacific is governed by the Federal Railroad Administration (FRA) and that it is required to comply with the general operating rules established by that agency, including rules governing

8

speed limits and air-brake testing. He told plaintiffs that he would consult with other managers to determine whether anything could be done to expedite train movement through the crossing.

Herren testified that he met with Union Pacific managers after the first meeting. He stated that Union Pacific had identified several processes that could be implemented to minimize the time a standing train blocked the crossing. One of the processes that Union Pacific had implemented was to get permission from Kansas City Southern Railroad to occupy its interlocking track. Union Pacific makes its request before its crew begins to assemble an outbound train. Union Pacific also obtained permission from the FRA to delay the air-brake testing until the outbound train has pulled past Monsanto Avenue. Union Pacific directed its crews to cut cars on the inbound trains before undertaking other tasks. Union Pacific regularly briefed its crews on the expedited procedures at the Monsanto Avenue crossing, and it posted a manager at the crossing to ensure that movement is expedited. Union Pacific also implemented a plan to cut the cars at the crossing for approaching emergency vehicles.

Herren stated that he notified Thomas, Keating, and Gerovac about the new procedures during the second meeting. He advised them that under normal circumstances his crews should be able to clear the crossing in less than 10 minutes. Herren estimated that the new procedures would alleviate 90% of the complained-of obstructions. He cautioned that a mechanical problem or a broken rail could cause unanticipated delays in clearing the crossing. Herren conceded that Union Pacific continued to receive complaints after the new procedures had been implemented. He candidly admitted that the railroad had voluntarily implemented the new procedures and that it would not guarantee that these procedures would continue if the injunction was lifted. But he also stated that the railroad intended to maintain the procedures unless circumstances changed, regardless of the outcome of the pending case.

In rebuttal, Tim Thomas testified that Herren never mentioned the new procedures during either meeting. He said that he first learned of the procedures when Herren testified in court.

9

On January 24, 2005, the circuit court entered an order granting a permanent injunction that prevented Union Pacific from obstructing the Monsanto Avenue crossing for a time period greater than 10 minutes, in accordance with section 18c-7402(1)(b) of the Vehicle Code.

## II. Analysis

### A. Private Right of Action

In its first point, Union Pacific claims that the trial court erred in finding that a private cause of action exists under section 18c-7402(1)(b) of the Vehicle Code. In support of its contention, Union Pacific relies on *Byrne v. City of Chicago*, 215 Ill. App. 3d 698, 576 N.E.2d 19 (1991).

In *Byrne*, a motorist brought an action against the City of Chicago to recover for the destruction of her automobile after it had been towed. She alleged that the city failed to comply with three sections of the Vehicle Code addressing the notification of owners prior to the disposal of impounded vehicles. Our colleagues in the First District were asked to consider whether a violation of those sections creates a private right of action for the injured party, and they concluded that it did not. *Byrne*, 215 Ill. App. 3d at 707-08, 576 N.E.2d at 24-25. We note that the sections of the Vehicle Code considered in *Byrne* are not the same as those at issue here and that, in deciding that case, the First District did not issue a blanket declaration that there is no private right of action under any section of the Vehicle Code. Its decision was confined to the three sections covering the disposal of impounded vehicles. *Byrne*, 215 Ill. App. 3d at 708, 576 N.E.2d at 24-25. For those reasons, *Byrne* is not helpful to a resolution of the issue before us.

In this case, plaintiffs' complaint is premised on allegations that Union Pacific repeatedly violates section 18c-7402(1)(b) of the Vehicle Code. Section 18c-7402(1)(b) provides as follows:

"(b) Obstruction of Highway at Grade Crossing Prohibited. It is unlawful for a rail carrier to permit any train, railroad car[,] or engine to obstruct public travel at a railroad-highway grade crossing for a period in excess of 10 minutes, except where such train or

10

railroad car is continuously moving or cannot be moved by reason of circumstances over which the rail carrier has no reasonable control." 625 ILCS 5/18c-7402(1)(b) (West 2002).

Section 18c-7402(1)(b) is found in a chapter of the Vehicle Code known as the Illinois Commercial Transportation Law (625 ILCS 5/18c-1101 *et seq.* (West 2002)). In enacting this chapter, the Illinois legislature stated as follows: "(a) a comprehensive recodification of existing transportation regulatory statutes is needed to delete obsolete provisions and facilitate a coordinated approach to regulation of motor carriers, rail carriers, and brokers; (b) the accelerating pace of change in the transportation industry, as an outgrowth of changing economic conditions and federal legislation, necessitates the streamlining of regulatory procedures to allow for prompt action to protect the interests of the people of the State of Illinois; and (c) *** existing enforcement mechanisms [are] inadequate." 625 ILCS 5/18c-1102 (West 2002).

Section 18c-1103 of the Illinois Commercial Transportation Law declares that the policy of the State of Illinois is "to actively supervise and regulate commercial transportation of persons and property within this state." 625 ILCS 5/18c-1103 (West 2002). It also directs that the policy shall be carried out in a manner that will "(a) promote adequate, economical, efficient[,] and responsive commercial transportation service, with adequate revenues to carriers and reasonable rates to the public, and without discrimination; (b) recognize and preserve the inherent advantages of, and foster sound economic conditions in, the several modes of commercial transportation in the public interest; *** (f) protect the public safety through administration of a program of safety standards and insurance; (g) insure a stable and well-coordinated transportation system for shippers, carriers[,] and the public; and (h) cooperate with the federal government, [with] the several states, and with the organizations representing states and commercial transportation service providers and consumers." 625 ILCS 5/18c-1103 (West 2002). Section 18c-7402(1)(b) carries forth the legislative intent in that it attempts to balance the interests of rail carriers to conduct its operations with the interests of highway travelers, including motor carriers, to free-flowing traffic, without unreasonable

11

interference, on the public roads in this state.

Against this backdrop, we consider whether there is a private right of action under section 18c-7402(1)(b). It has been long held that when a statute is enacted to protect a particular class of individuals, courts may imply a private right of action even though no express remedy has been provided in the statute. *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 89 Ill. 2d 379, 386, 432 N.E.2d 849, 852 (1982); *Heimgaertner v. Benjamin Electric Manufacturing Co.*, 6 Ill. 2d 152, 128 N.E.2d 691 (1955). In order to determine whether there is an implicit private right of action in a statute that does not expressly provide one, our courts have considered a number of factors, including whether plaintiff is a member of a class for whose benefit the statute was enacted, whether plaintiff's injury is one the statute was designed to prevent, whether a private right of action is consistent with the underlying purpose of the statute, and whether a private right of action is necessary to provide an adequate remedy for violations of the statute. *Corgan v. Muehling*, 143 Ill. 2d 296, 312-13, 574 N.E.2d 602, 609 (1991); *Sawyer Realty Group, Inc.*, 89 Ill. 2d at 388-89, 432 N.E.2d at 853.

Section 18c-7402(1)(b) was enacted to encourage rail carriers to eliminate the unreasonable obstruction of railroad crossings in order to protect lives and property and to allow the free flow of commercial and personal travel. It is clear that plaintiffs are members of a class for whose benefit section 18c-7402(1)(b) was enacted and that the economic injury alleged is a harm that the statute was designed to prevent. In this case, there is evidence to show that the business operations of plaintiffs depend on the accessibility of their facilities to employees and to the truckers who pick up and deliver commodities and supplies, that Monsanto Avenue provides the only reasonable means of access to and from plaintiffs' facilities, and that repeated, lengthy obstructions of the Monsanto Avenue crossing have economic ramifications and consequences for the health and safety of those who work in the industrial complex. The pursuit of a private right of action to redress the harm caused by the unreasonable obstruction of a railroad crossing is consistent with one of the underlying purposes of the statute, and there is no indication that the legislature intended to limit the

12

available remedies for violations of the statute. The fines imposed under the statute are relatively small. 625 ILCS 5/18c-7402(1)(c) (West 2002). Multiple fines may not provide sufficient incentive to deter future violations. Further, fines offer nothing to ameliorate the financial hardships sustained by plaintiffs and their suppliers. After considering the pertinent factors, we conclude that plaintiffs have an implied private right of action under section 18c-7402(1)(b) of the Vehicle Code.

## B. Preemption

Union Pacific claims that the trial court erred in finding that plaintiffs' claims, based on violations of section 18c-7402(1)(b), are not preempted by the Federal Railroad Safety Authorization Act of 1994 (49 U.S.C. §§20101 through 20153 (2000)), the ICC Termination Act of 1995 (49 U.S.C. §§10101 through 16106 (2000)), and the commerce clause of the United States Constitution (U.S. Const., art. I, §8, cl. 3).

### 1. Commerce Clause

The United States Constitution empowers the Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., art. I, §8, cl. 3. However, in the absence of conflicting legislation by the Congress, there is a residuum of power in the states to enact laws governing matters of local concern that in some measure affect interstate commerce. *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 767, 89 L. Ed. 1915, 1923, 65 S. Ct. 1515, 1519 (1945); *People v. Kesler*, 186 Ill. 2d 413, 712 N.E.2d 341 (1999). Where the incentive to deal with a matter nationally is slight and where the state's regulation does not seriously interfere with the operations of interstate commerce, the regulation has been generally held to be within the state's authority. *Southern Pacific Co.*, 325 U.S. at 767, 89 L. Ed. at 1923, 65 S. Ct. at 1519; *People v. Indiana Harbor Belt R.R. Co.*, 102 Ill. App. 3d 811, 430 N.E.2d 104 (1981). Where a state regulation affecting interstate commerce constitutes nothing more than " 'simple economic protectionism,' " it has been held to be *per se* invalid under the commerce clause. *Kesler*, 186 Ill. 2d at 416, 712 N.E.2d at 342 (quoting *Russell Stewart Oil Co. v. State of Illinois*, 124 Ill. 2d

13

116, 122, 529 N.E.2d 484, 486 (1988)).  In determining the validity of a state regulation under the commerce clause, a court must consider the weight and nature of the state regulatory concern in light of the extent of the burden on interstate commerce.  *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 441, 54 L. Ed. 2d 664, 675, 98 S. Ct. 787, 794 (1978); *Kesler*, 186 Ill. 2d at 416, 712 N.E.2d at 342.

Section 18c-7402(1)(b) has nothing to do with economic protectionism.  It reflects a legislative intent to take a cooperative and coordinated approach toward protecting public safety and private property while enhancing the commercial transportation industry.  See 625 ILCS 5/18c-1103 (West 2002).  As previously noted, the statute serves the twofold purpose of furthering the safety of the traveling public and balancing the interests of rail carriers and motor carriers engaged in commerce.

In *People v. Indiana Harbor Belt R.R. Co.*, the appellate court upheld the validity of a prior version of the statute—section 14 of "An Act in relation to fencing and operating railroads" (Ill. Rev. Stat. 1979, ch. 114, par. 70)—against a challenge that it imposed an unreasonable burden on interstate commerce and violated the commerce clause.  *Indiana Harbor Belt R.R. Co.*, 102 Ill. App. 3d at 813, 430 N.E.2d at 106.  The court rejected defendant's contention that section 14 restricted the flow of interstate commerce in that it indirectly forced the carrier to limit train length and to increase the number of trains, which would potentially cause track congestion and increases in costs and exposure to accidents.  *Indiana Harbor Belt R.R. Co.*, 102 Ill. App. 3d at 818-19, 430 N.E.2d at 109-10.  The court found that section 14 served to encourage rail carriers to eliminate the unreasonable obstruction of railroad crossings in order to protect human life and property and to allow the free flow of traffic through the area.  *Indiana Harbor Belt R.R. Co.*, 102 Ill. App. 3d at 818-19, 430 N.E.2d at 109-10.  The court concluded that section 14 addressed a local problem without effect on interstate uniformity and that any burden on interstate commerce was small and did not materially restrict the free flow of commerce across state lines.  *Indiana Harbor Belt R.R. Co.*, 102 Ill. App. 3d

14

at 818-19, 430 N.E.2d at 109-10. Though section 14 applied to both moving and standing trains and thereby differs from the current version of the statute, we find that the court's reasoning is instructive and applicable here.

Section 18c-7402(1)(b) applies to standing trains that block a crossing for more than 10 minutes. Since this section does not apply to moving trains, it cannot be deemed to indirectly dictate the length, the speed, or the schedule of interstate trains. See *Indiana Harbor Belt R.R. Co.*, 102 Ill. App. 3d at 818-19, 430 N.E.2d at 109-10. In addition, section 18c-7402(1)(b) specifically excepts trains that are continuously moving and those that cannot be moved because of circumstances over which the railroad has no reasonable control. Union Pacific has not shown that the statute adversely affects the national interest in an economical and efficient railway transportation service or that it imposes an unconstitutional burden on interstate commerce. The circuit court correctly concluded that section 18c-7402(1)(b) is not preempted by the commerce clause.

### 2. ICC Termination Act of 1995

Union Pacific next contends that section 18c-7402(1)(b) is preempted by the ICC Termination Act of 1995 (ICCTA) (49 U.S.C. §§10101 through 16106 (2000)).

When Congress enacted the ICCTA, which became effective on January 1, 1996, it abolished the Interstate Commerce Commission and established the Surface Transportation Board as an agency within the United States Department of Transportation. See 49 U.S.C. §701(a) (2000). Congress directed that the Surface Transportation Board would perform all the functions that had been previously performed by the Interstate Commerce Commission. See 49 U.S.C. §702 (2000). Congress also vested in the Surface Transportation Board exclusive jurisdiction over transportation by rail carriers with respect to (1) the rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, and facilities of rail carriers and (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, even if the tracks are located or intended to be located entirely in one state. 49 U.S.C.

§10501(b) (2000). As the successor to the Interstate Commerce Commission, it is charged with the fundamental mission of resolving railroad rate and service disputes and reviewing proposed mergers, line sales, line construction, and abandonments. See 49 U.S.C. §11101 *et seq.* (2000).

In reading the aforementioned federal statutes and the corresponding federal regulations in light of the regulatory rail policy of the United States (49 U.S.C. §10101 (2000)), it is clear that Congress intended the ICCTA to occupy the entire field of economic regulation of the interstate rail transportation industry and that the Surface Transportation Board was created to act as the economic regulator, engaged in managing the industry's business operations. However, the ICCTA 's exclusive authority over the economic regulation of the railway industry does not foreclose the Secretary of Transportation's authority over safety in all areas of railroad operations (49 U.S.C. §20101 (2000)) or a state's traditional regulation of public safety. See *Iowa, Chicago & Eastern R.R. Corp. v. Washington County, Iowa*, 384 F.3d 557, 561-62 (8th Cir. 2004). Although the extent of the authority of the Surface Transportation Board is evident from the plain wording of the aforementioned statutes, it is worth noting that our reading of those statutes is consistent with the intent expressed in the legislative history. See H.R. Rep. No. 104-311, 104th Cong., 1st Sess., at 95-96 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 807-08; S. Rep. No. 104-176 (1995).

It seems relatively clear that matters affecting regulation and competition, such as mergers and track acquisitions or abandonments, and matters of capital improvements, such as additions to or restorations of infrastructure, are matters within the jurisdiction of the Surface Transportation Board. See, *e.g., City of Auburn v. United States Government*, 154 F.3d 1025 (9th Cir. 1998). Statutes and ordinances that impact a train's speed, length, and schedule have been found to have concomitant economic ramifications and, thus, are deemed to address areas under the jurisdiction of the Surface Transportation Board. See, *e.g., Friberg v. Kansas City Southern Ry. Co.*, 267 F.3d 439 (5th Cir. 2001) (an antiblocking statute contained no exception for a train obstructing a crossing due to circumstances beyond its control); *City of Seattle v. Burlington Northern R.R. Co.*, 145 Wash. 2d

661, 41 P.3d 1169 (2002) (an antiblocking ordinance reserved the city's right to regulate the speed of trains and the maximum time a train is allowed to block a crossing, and it contained no exception for a train obstructing the crossing due to circumstances beyond its control). However, where the state regulation in question does not foreclose or interfere with the railroad's interstate rail operations or otherwise unreasonably burden interstate commerce, the regulation is not preempted. See, *e.g, Iowa, Chicago & Eastern R.R. Corp.*, 384 F.3d at 561-62; *Home of Economy v. Burlington Northern Santa Fe R.R.*, 2005 ND 74, 694 N.W.2d 840 (2005); *State ex rel. Oklahoma Corp. Comm'n v. Burlington Northern & Santa Fe Ry. Co.*, 2001 OK CIV APP 55, ¶13, 24 P.3d 368, 371-72 (2000).

Earlier in this decision, we determined that section 18c-7402(1)(b) does not indirectly regulate the speed, length, or schedule of Union Pacific's trains or otherwise interfere with its railroad operations. There is no evidence that compliance with the statute would require Union Pacific to make capital improvements or to renovate the Monsanto Avenue crossing or the nearby spurs. Union Pacific has not shown that section 18c-7402(1)(b) impinges on the Surface Transportation Board's authority to regulate transportation rates, classifications, rules, practices, routes, and facilities of carriers. Nor has it demonstrated that the statute touches on or interferes with the economic regulation of the railroad industry. The trial court correctly concluded that section 18c-7402(1)(b) is not preempted by the ICCTA.

### 3. Federal Railroad Safety Authorization Act of 1994

Union Pacific next contends that section 18c-7402(1)(b) is preempted by the Federal Railroad Safety Authorization Act of 1994 (FRSA) (49 U.S.C. §§20101 through 20153 (2000)).

Section 20101 of the FRSA states that the purpose of the chapter is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. §20101 (2000). Section 20103(a) authorizes the Secretary of Transportation to prescribe regulations and issue orders for every area of railroad safety. 49 U.S.C. §20103(a) (2000). While section 20106 provides for national uniformity of laws, regulations, and orders to the extent practicable, it also

17

authorizes a state to "adopt or continue in force a law, regulation, or order related to railroad safety" until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the state regulation. 49 U.S.C. §20106 (2000). A state may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order is necessary to eliminate or reduce an essentially local safety or security hazard; is not incompatible with a law, regulation, or order of the United States government; and does not unreasonably burden interstate commerce. 49 U.S.C. §20106 (2000). The Secretary of Transportation is authorized to "waive compliance with any part of a regulation prescribed or order issued under this chapter if the waiver is in the public interest and consistent with railroad safety." 49 U.S.C. §20103(d) (2000).

Section 18c-7402(1)(b) was implemented to address local safety hazards that arise when a thoroughfare is repeatedly obstructed for an unreasonable time by standing trains. *Indiana Harbor Belt R.R. Co.*, 102 Ill. App. 3d at 818-19, 430 N.E.2d at 109-10. Local hazards unique to the Monsanto Avenue crossing include the inability of emergency responders to get to a populated industrial complex without delay and the congestion of a major thoroughfare. Compliance with section 18c-7402(1)(b) may substantially reduce the risks posed by these hazards.

Union Pacific has acknowledged that there is no statute, rule, or regulation under the FRSA that addresses the amount of time a standing train may obstruct a railroad crossing. However, it contends that it is impossible to comply with section 18c-7402(1)(b) and with the federal regulations that mandate air-brake testing before a train can leave a terminal. Union Pacific notes that some of the cars on its outbound trains obstruct Monsanto Avenue while air-brake tests are done. Union Pacific contends that section 18c-7402(1)(b) is preempted because compliance with the statute indirectly interferes with its ability to conduct air-brake tests. We reject this contention.

Section 18c-7402(1)(b) excepts from compliance a train or railroad car that cannot be moved by reason of circumstances over which a rail carrier has no reasonable control. A situation where an

18

outbound train remains in the crossing for more than 10 minutes because the crew is diligently conducting air-brake testing pursuant to a mandatory federal regulation may constitute a circumstance beyond the control of the rail carrier. Having said that, we note that Union Pacific's director of terminal operations testified that Union Pacific applied for and obtained permission to conduct its air-brake testing after its outbound trains clear the Monsanto Avenue crossing. While the FRSA authorization remains in effect, Union Pacific will be hard-pressed to offer brake testing as a justification for blocking the Monsanto Avenue crossing with a standing train for more than 10 minutes. Union Pacific has not shown that section 18c-7402(1)(b) interferes with any safety regulation imposed under the FRSA or that it unreasonably burdens commerce. The circuit court correctly concluded that section 18c-7402(1)(b) is not preempted by the FRSA.

## C. Sufficiency of the Evidence to Support a Permanent Injunction

In its final point, Union Pacific contends that the circuit court should have entered a judgment in its favor because plaintiffs failed to present sufficient evidence for the entry of a permanent injunction. Union Pacific argues that plaintiffs do not have an unlimited right to access their property by means of Monsanto Avenue when an alternate route exists. Union Pacific also contends that plaintiffs failed to establish that the legal remedies are inadequate and that they have been irreparably harmed.

In order to obtain a permanent injunction, a plaintiff must show that he has a lawful ascertainable right in need of protection, that he will suffer irreparable injury without the protection, and that there is no adequate remedy at law. *American National Bank & Trust Co. of Chicago v. Carroll*, 122 Ill. App. 3d 868, 880-81, 462 N.E.2d 586, 595 (1984).

In this case, the evidence in the record clearly shows that Monsanto Avenue is the only feasible means of accessing plaintiffs' properties and that there is no safe alternate route. The evidence also shows that plaintiffs contacted Union Pacific numerous times to complain about its trains blocking Monsanto Avenue for extended periods, that Union Pacific failed to respond to those

19

complaints, and that plaintiffs pleaded with the mayor of Sauget to summon the railroad for a conference, which was ultimately unsuccessful. Though Union Pacific did implement some procedures to reduce the amount of time its standing trains obstruct the crossing, it made no guarantee that the procedures were permanent. There is evidence indicating that plaintiffs' employees, suppliers, and customers have incurred substantial delays in getting to and from plaintiffs' facilities and that, as a consequence, plaintiffs have lost some productive senior employees and their relationships with local farmers, elevator operators, and other customers have been damaged. There is also evidence that the obstructed crossing poses a threat to the safety of those who work in the industrial complex and to the public. There is substantial evidence in the record to support the circuit court's findings that Union Pacific repeatedly violated section 18c-7402(1)(b) and that plaintiffs' property rights have been infringed by that conduct, that the obstruction of Monsanto Avenue has harmed and will continue to harm plaintiffs, and that there is no adequate remedy at law to address the repeated violations. The court did not err in granting injunctive relief.

### III. Conclusion

In this case, we have concluded that plaintiffs have an implied private right of action under section 18c-7402(1)(b) of the Vehicle Code, that plaintiffs' action is not preempted by federal law, and that there is sufficient evidence to satisfy the requirements for a permanent injunction. Accordingly, the judgment of the circuit court of St. Clair County is affirmed.


Affirmed.


SPOMER, P.J., and McGLYNN, J., concur.


20

NO. 5-05-0038

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| EAGLE MARINE INDUSTRIES, INC., RIVER CITY LANDSCAPE SUPPLY, INC., and CONAGRA FOODS, INC., d/b/a PEAVEY COMPANY, | ) Appeal from the<br>) Circuit Court of<br>) St. Clair County.<br>)<br>) |
|---|---|
| Plaintiffs-Appellees, | )<br>) |
| v. | ) No. 03-CH-1040<br>) |
| UNION PACIFIC RAILROAD COMPANY, | ) Honorable<br>) Richard A. Aguirre, |
| Defendant-Appellant. | ) Judge, presiding. |

_____

**Opinion Filed**:   March 9, 2006

_____

**Justices**:   Honorable James K. Donovan, J.

Honorable Stephen L. Spomer, P.J., and
Honorable Stephen P. McGlynn, J.,
Concur

_____

**Attorneys for Appellant**   Thomas E. Jones, Heath H. Hooks, Thompson Coburn, LLP, 525 West Main Street, P.O. Box 750, Belleville, IL 62222-0750

_____

**Attorneys for Appellees**   Christopher Cueto, Law Office of Christopher Cueto, Ltd., 7110 West Main Street, Belleville, IL 62223; Stephen R. Wigginton, Weilmuenster & Wigginton, P.C., 3201 West Main Street, Belleville, IL 62226

_____