(No. 65402.—

NATIONAL COMMERCIAL BANKING CORPORATION OF AUSTRALIA, LTD., *et al.*, Appellees, v. WILLIAM C. HARRIS, Commissioner of Banks and Trust Companies of the State of Illinois, Appellant.

*Opinion filed December 15, 1988.*

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Rita M. Novak, Assistant Attorney General, of Chicago, of counsel), for appellant.

Richard M. Franklin and Jerome W. Jakubik, of Baker & McKenzie, of Chicago, for appellees.

Richard K. Willard, Assistant Attorney General, and Paul Allan Scott, L. Robert Griffin and David C. Douglas, of Washington, D.C., for *amicus curiae* Comptroller of the Currency of the United States.

JUSTICE CLARK delivered the opinion of the court:

At issue in this appeal is a provision of the Foreign Banking Office Act (the Act) (Ill. Rev. Stat. 1985, ch. 17,

par. 2701 *et seq.*) which imposes a nonreciprocal license fee upon foreign banks which "do[] not provide reciprocal licensing authority" to Illinois State or national banks (Ill. Rev. Stat. 1985, ch. 17, par. 2710). The circuit court of Cook County declared section 3 of the Act (Ill. Rev. Stat. 1985, ch. 17, par. 2710) void and unenforceable on its face for its imposition of the nonreciprocal license fee. The court held that the Act violated Federal statutory law and the Constitutions of the United States and Illinois. The Commissioner of Banks and Trust Companies of the State of Illinois (the Commissioner) thereupon filed this direct appeal pursuant to Supreme Court Rule 302(a)(1) (107 Ill. 2d R. 302(a)(1)). The Comptroller of the Currency of the United States (the Comptroller) was given leave to file an *amicus curiae* brief in support of appellees' position.

Appellees are three Australian banks that received authorization in late 1981 and 1982 from the Comptroller to establish limited Federal branches in Illinois pursuant to the International Banking Act of 1978 (the International Banking Act) (12 U.S.C. §3101 *et seq.* (1982)). Under the provisions of the International Banking Act, limited Federal branches are restricted as to deposits they can receive; only such deposits as are permissible to Edge Act corporations (deposits linked to international trade) under section 25(a) of the Federal Reserve Act are allowed. (12 U.S.C. §3103(a)(1) (1982).) Appellees each opened a limited Federal branch office in the Chicago Loop area.

In December 1983, the Commissioner mailed to each appellee a fee statement demanding payment of the nonreciprocal license fee imposed under the provisions of section 3 of the Foreign Banking Office Act (Ill. Rev. Stat. 1985, ch. 17, par. 2710). The fee of $63,287.67 was for a prorated portion of 1983 and for all of 1984. Appellees refused to pay the fee and instead initiated an

action in the circuit court challenging the Commissioner's authority to collect the fee. The portion of section 3 of the Act subject to review and under which the Commissioner claimed authority to collect the fee provides:

"A foreign banking corporation, upon receipt of a certificate of authority from the Commissioner, may establish and maintain a single banking office in the central business district of Chicago and may conduct thereat a general banking business. *** [I]f a foreign banking corporation shall be licensed by any banking supervisory authority of a jurisdiction other than the Commissioner, and the foreign nation within which a foreign banking corporation so licensed does not provide reciprocal licensing authority to Illinois State of [sic] National Banks, then such foreign banking corporation shall pay an annual 'non-reciprocal' license fee to the State of Illinois which shall be deposited in the General Revenue Fund. Such annual fee shall be in an amount of $50,000." Ill. Rev. Stat. 1985, ch. 17, par. 2710.

Appellees contend that imposition of the nonreciprocal fee violates the supremacy clause of the United States Constitution (U.S. Const., art. VI, cl. 2) because it conflicts with section 5(a)(1) of the International Banking Act (12 U.S.C. §3103(a)(1) (1982)) by attempting to regulate the licensing of a limited Federal branch. Section 5(a)(1) provides:

"(a) Except as provided by subsection (b) of this section, (1) no foreign bank may directly or indirectly establish and operate a Federal branch outside of its home State unless (A) its operation is expressly permitted by the State in which it is to be operated, and (B) the foreign bank shall enter into an agreement or undertaking with the Board to receive only such deposits at the place of operation of such Federal branch as would be permissible for a corporation organized under section 25(a) of the Federal Reserve Act under rules and regulations administered by the Board[.]" 12 U.S.C. §3103(a)(1) (1982).

The Commissioner, on the other hand, contends that the very language of the Federal statute (*i.e.*, "expressly permitted by the State") permits just the kind of regulation and fee imposed through the Illinois statute. Appellees point out, however, that section 5(a) must be read not in isolation but in conjunction with the remainder of the International Banking Act as well as in conjunction with the rules and regulations promulgated thereunder. Thus, appellees contend that the license fee imposed under the Illinois statute also violates the supremacy clause because it discriminatorily taxes some foreign banks in contravention of section 4(b) of the International Banking Act (12 U.S.C. §3102(b) (1982)) and that, therefore, section 548 of the National Bank Act (12 U.S.C. §548 (1982)) is violated as well as the regulations promulgated by the Comptroller. Section 4(b) of the International Banking Act provides in part:

> "(b) In establishing and operating a Federal branch or agency, a foreign bank shall be subject to such rules, regulations, and orders as the Comptroller considers appropriate to carry out this section, which shall include provisions for service of process and maintenance of branch and agency accounts separate from those of the parent bank. Except as otherwise specifically provided in this chapter or in rules, regulations, or orders adopted by the Comptroller under this section, operations of a foreign bank at a Federal branch or agency shall be conducted with the same rights and privileges as a national bank at the same location and shall be subject to all the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the National Bank Act to a national bank doing business at the same location ***." (12 U.S.C. §3102(b) (1982).)

Because provisions in the International Banking Act grant Federal branches or agencies the same rights and privileges accorded national banks, section 548 of the National Bank Act is applicable; that section provides

that "[f]or the purposes of any tax law enacted under authority of the United States or any State, a national bank shall be treated as a bank organized and existing under the laws of the State or other jurisdiction within which its principal office is located." 12 U.S.C. §548 (1982).

Appellees also contend that the nonreciprocal license fee violates the commerce clause of the United States Constitution (U.S. Const., art. I, §8, cl. 3), the equal protection clauses of the United States (U.S. Const., amend. XIV, §1) and Illinois (Ill. Const. 1970, art. I, §2) Constitutions, and the due process clauses of the United States (U.S. Const., amend. XIV, §1) and Illinois (Ill. Const. 1970, art. I, §2) Constitutions; that it is an unconstitutional attempt to interfere with foreign-policy-making powers of the Federal government in violation of various constitutional sections (U.S. Const., art. I, §10, cl. 1; art. II, §2, cl. 2; art. II, §3); and that it violates the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, §2).

The circuit court held that the statute was unconstitutional on the following grounds: (1) the statute violates the supremacy clause of the United States Constitution because it conflicts with section 5 of the International Banking Act (12 U.S.C. §3103 (1982)); (2) the statute violates the supremacy clause of the United States Constitution because it conflicts with section 548 of the National Bank Act (12 U.S.C. §548 (1982)); (3) the statute violates the commerce clause of the United States Constitution; and (4) the statute violates the equal protection clauses of the United States and Illinois Constitutions. Because the court found that appellees were entitled to summary judgment for the above-enumerated reasons, it did not discuss other grounds presented. We affirm the circuit court's decision that the Foreign Banking Office Act's imposition of the nonreciprocal license fee in sec-

tion 3 (Ill. Rev. Stat. 1985, ch. 17, par. 2710) is void and unenforceable as violative of the supremacy clause. Because we reach our decision based on preemption, we do not address other issues presented by the parties.

Rules and regulations for implementation of the International Banking Act have been promulgated by the Comptroller pursuant to the statute. In both the preliminary rule published for comment and the final rule reported in the Federal Register, the Comptroller specifically addressed the issue of State reciprocity requirements. The following statement from the proposed rule is pertinent:

> "[I]n some States a foreign bank which applies for a branch or agency must be able to demonstrate that the country under whose laws it was organized permits free access to U.S. banks. Such a reciprocity approach would not be binding upon the Comptroller's Office because it is incompatible with the national theme of the IBA and, further, it is in the nature of a condition or limitation rather than a prohibition on foreign entry." (44 Fed. Reg. 27431 (1979).)

The Comptroller again addressed the issue in the final rule based on comments received following publication of the proposed rule. In pertinent part, he noted that he would "not undermine the general approach embodied in the IBA by trying to enforce a variety of reciprocity provisions—and the sometimes subtle administrative judgments which accompany them—of some of the states." 44 Fed. Reg. 65382 (1979).

Appellees contend that their position is further supported by the district court's recent decision in Conference of State Bank Supervisors v. Heimann (D.D.C. Sept. 30, 1981), No. 80—3284, *aff'd in part & rev'd in part sub nom. Conference of State Bank Supervisors v. Conover* (D.C. Cir. 1983), 715 F.2d 604 (hereinafter cited as *Conover*). *Conover* involved interpretation of the In-

ternational Banking Act's licensing provisions. The Illinois Commissioner intervened in *Conover* as a plaintiff seeking declaratory and injunctive relief which would prohibit the Comptroller from licensing two Australian banks which had received authorization to open limited Federal branches in Illinois. Operation of the Australian limited branches violated an Illinois statute which included a reciprocity requirement. At the time of the *Conover* case, the Illinois statute required that a foreign country extend reciprocity to Illinois State or national banks as a prerequisite to obtaining a certificate of authority to operate within this State. The Illinois statute read as follows:

> "No such foreign banking corporation is, however, entitled to a certificate of authority under this Act unless, under the laws of the country under which such foreign banking corporation was organized, a State bank and a national bank may be authorized to maintain banking offices which may engage in a general banking business or may be authorized to own all the shares (except for directors' qualifying shares) of a banking corporation organized under the laws of such country." Ill. Rev. Stat. 1983, ch. 17, par. 2710 (amended by Pub. Act 83—1362, art. II, §9, eff. Sept. 11, 1984).

In affirming summary judgment for the Comptroller, the court upheld the Comptroller's right under the International Banking Act to license limited Federal branches in any State which generally permits foreign banks. The district court in *Conover* held that the Commissioner was precluded from excluding or regulating any limited Federal branches on the basis of the reciprocity requirement. A State, under the International Banking Act, the court held, could completely preclude foreign banks from operating within its borders, or in the alternative it could permit only branches or only agencies, but it could not further regulate them. (*Conover*, 715 F.2d at 622.)

Following the *Conover* decision, the Illinois legislature amended the Act to impose the $50,000 annual license fee upon federally licensed foreign banks whose home country did not provide reciprocity to Illinois or national banks. The amended statute, previously set out in this opinion, is the statute being challenged in this present action.

We first address appellees' contention that the Commissioner is collaterally estopped from imposing the nonreciprocal license fee and relitigating an issue that supposedly was decided adversely to his position in *Conover*. Collateral estoppel is an equitable doctrine founded on principles of judicial economy intended to prevent relitigation of previously adjudicated claims. (*Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 113.) This court recently reiterated the questions to be addressed in determining the applicability of collateral estoppel in *Ballweg*:

> "(1) whether the issue decided in the prior adjudication is identical with the one presented in the case in question; (2) whether there had been a final judgment on the merits; and (3) whether the party against whom estoppel is asserted is a party or in privity with a party to the prior adjudication." (*Ballweg*, 114 Ill. 2d at 113.)

Appellant contends that this court need not even address the issue of collateral estoppel because "[t]he general rule is that decisions of the United States district and circuit courts are not binding upon Illinois courts." (*City of Chicago v. Groffman* (1977), 68 Ill. 2d 112, 118.) Our court has never meant by this proposition that we will ignore or negate the persuasive authority that a Federal decision may provide when it concerns a similar issue. (See, *e.g.*, *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112; *People ex rel. Lignoul v. City of Chicago* (1977), 67 Ill. 2d 480.) However, because we find that the issues presented in *Conover* are not identical with the issues presented in this case, we proceed with an independent

review. *Conover*, as we discuss more fully below, involved a determination of whether the regulations promulgated by the Comptroller were in conflict with the Federal statute, while the instant case involves a determination of the constitutionality of a fee imposed under an Illinois statute.

Applying the *Ballweg* three-prong test, we note that the Commissioner intervened in the *Conover* case and was therefore a party to the prior adjudication; that the Australian banks were not a party to the prior action is of no relevance under this test. Additionally, the *Conover* decision has long since become final following the Supreme Court's denial of *certiorari*. *Conference of State Bank Supervisors v. Conover* (1984), 466 U.S. 927, 80 L. Ed. 2d 181, 104 S. Ct. 1708.

The only question left for this court to address in review of appellees' collateral estoppel claim is whether the issue presented in the prior adjudication is identical with the issue presented in the instant case. We note that plaintiffs in *Conover*, including the Commissioner, were challenging the regulations and interpretive statements adopted by the Comptroller pursuant to the International Banking Act based on their contention that the regulations and statements were in conflict with the explicit provisions in sections 4 and 5 of the International Banking Act. (*Conover*, 715 F.2d at 605.) The court examined the legislative history of the International Banking Act to evaluate the scope of the Comptroller's authority. Following review of the history of the legislation, the *Conover* court affirmed the Comptroller's interpretation of the statute as evidenced in the regulations and statements. It thereby affirmed the Comptroller's right to license a foreign bank in a receiving State if that State permits foreign banks to establish State-chartered interstate branches. The Comptroller, the court stated, is

not required to comply with State-law reciprocity requirements.

The Illinois statute prior to the *Conover* decision limited admittance of foreign banks to those whose home country granted reciprocal rights to Illinois State or national banks. The statute in force at the time of *Conover* had been enacted at a time when foreign-chartered banks were only authorized to transact business in the United States under the laws and regulations of the individual States. Subsequent to the *Conover* decision, the Illinois legislature amended the statute, as noted and set out previously, to provide for the $50,000 license fee. The amended statute does not prevent foreign banks whose home countries do not grant reciprocity from opening an office in Illinois, as did its predecessor, it instead imposes a nonreciprocal license fee. It is the validity of this nonreciprocal license fee imposed under the amended statute which is before our court today. Although our review of the validity of the fee does involve an analysis of the Federal statute as well as the regulations and policy statements of the Comptroller, this alone does not transform the instant case into presentation of issues "identical" to those adjudicated in *Conover* such as to preclude our review. Appellees' claim of collateral estoppel fails.

We turn now to a review of section 3 of the Foreign Banking Office Act (Ill. Rev. Stat. 1985, ch. 17, par. 2710) to determine its constitutionality under the supremacy clause of the United States Constitution (U.S. Const., art. VI, cl. 2). Prior to enactment of the International Banking Act (12 U.S.C. §3101 *et seq.*), regulation of foreign-chartered banks had been solely under the jurisdiction of the individual States. That plan of regulation meant that a foreign-chartered bank could potentially, and often did, operate its offices out of several

States and thereby offer customers advantages that were not available through State or national institutions.

The dual banking system has been in place since the Civil War, when a system of national banks was created not only to assist in financing the war effort but also with the expectation that a national system would eventually replace the then-current exclusive State system. (Act of Feb. 25, 1863, ch. 58, 12 Stat. 665 (repealed 1864, current version at 12 U.S.C. §§21 through 215); see also Scott, *The Dual Banking System: A Model of Competition in Regulation*, 30 Stan. L. Rev. 1, 9 (1977).) The total replacement of the State system never materialized and the evolution of the dual banking system progressed. As noted by a representative of the National Association of Supervisors of State Banks, " '[t]he dual banking system ... is a vital national goal with roots deep in our constitutional history, and one of the very reasons why this country has achieved an economic growth unparalleled among the nations of the world.' " (Scott, *The Dual Banking System*, 30 Stan. L. Rev. at 1 (quoting F. Shelby Cullom).) Under the dual banking system, an American banking institution can choose to be chartered either under State regulations or under Federal regulations. A foreign-chartered bank, prior to enactment of the International Banking Act, had no such choice, however.

In enacting the International Banking Act, Congress indicated its intention to, for the first time, allow foreign banks the same State-Federal option in States where foreign banks are welcome. (S. Rep. No. 1073, 95th Cong., 2d Sess. 6, *reprinted in* 1978 U.S. Code Cong. & Admin. News 1421, 1426 (hereinafter cited as 1978 Senate Report).) In discussing the need for the change in policy regarding foreign-chartered banks, the Senate report noted the following:

"The general policy of the United States with regard to foreign enterprises doing business in the United States has been one of national treatment. Under this policy foreign enterprises operating in the host country are treated as competitive equals with their domestic counterparts. There is, at this time, no uniform national policy concerning foreign banking operation in this country. As a result, foreign banks enjoy many competitive advantages over our domestic banks. This bill establishes the principle of parity of treatment between foreign and domestic banks ***." (1978 Senate Report at 2.)

In bringing international banking regulation more in line with regulation of other international business endeavors, the authors of the report noted that "[t]he committee thus believes *national treatment is the most appropriate policy* to adopt with respect to foreign banks in the United States, and this means some measure of basic competitive equality on interstate branching." (Emphasis added.) (1978 Senate Report at 9.) Congress apparently intended to set aside the hodgepodge State-by-State system of regulating foreign-chartered banks by establishing one cohesive national system.

The Commissioner urges that this court must consider the regulatory interests of Illinois in encouraging foreign countries to offer reciprocal privileges to Illinois or national banks and that we should therefore address whether a State-imposed reciprocity restriction necessarily conflicts with Federal law.

We note that this Federal law was enacted to regulate and control foreign banking enterprises. This court noted in *Springfield Rare Coin Galleries, Inc. v. Johnson* (1986), 115 Ill. 2d 221, in discussing the effect of State-imposed laws that affect foreign countries, that "action by individual States in the field of foreign policy will lead to a lack of uniformity. Thus, Federal power in the field of foreign relations must be left free from local

interference." (115 Ill. 2d at 233.) This was not a blanket prohibition against State statutes that have some effect on foreign nations, for this court indicated that there must be "[s]omething more than an indirect or incidental effect." (115 Ill. 2d at 233.) As in *Springfield Rare Coin* and the cases cited therein, the statute here in question falls on the impermissible side of the line of demarcation between incidental and unconstitutional intrusions into foreign affairs. When one of the congressional purposes of the statute is to, as a nation, advance and protect the status of American banks abroad, this role cannot be usurped by the State. See 1978 Senate Report at 23, Study on Treatment of United States Banks Abroad (Analysis) §9.

Additionally, we note that the Supreme Court has stated:

> "The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail. Article VI, Clause 2. This principle was made clear by Chief Justice Marshall when he stated for the Court that any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield. [Citations.] Thus our inquiry is directed toward whether there is a valid federal law, and if so, whether there is a conflict with state law." *Free v. Bland* (1962), 369 U.S. 663, 666, 8 L. Ed. 2d 180, 183, 82 S. Ct. 1089, 1092.

See also *Felder v. Casey* (1988), 487 U.S. ___, ___, 101 L. Ed. 2d 123, 138, 108 S. Ct. 2302, 2306.

Further, this court has previously held that "[e]ven in legislation in which Congress has not totally displaced State regulation in a specific area, State law is preempted to the extent that it actually conflicts with Federal law or if it stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."

*Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill. 2d
502, 508.

Preemption, which has its origin in the supremacy
clause of the United States Constitution (U.S. Const.,
art. VI, cl. 2), provides that in some instances Federal
law will override State laws on the same subject. (*Rice v.
Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 229-31,
91 L. Ed. 1447, 1459, 67 S. Ct. 1146, 1151-53.) At the
core of a court's review under the preemption doctrine is
a determination of the intent—the objective or purpose—
of Congress in enacting the particular statute. The court
must answer the question: Did Congress intend to sup-
plant State laws? (*Kellerman v. MCI Telecommunica-
tions* (1986), 112 Ill. 2d 428, 438.) As this court noted in
*Kellerman*, "this is no easy task because rarely does
Congress *** expressly provide that concurrent State
laws will be preempted. Rather, a court must usually di-
vine for itself whether the statute evidences an intent by
Congress to preempt State law." (112 Ill. 2d at 438.)
The Supreme Court has, however, enumerated some
well-established principles to follow:

> "Absent explicit pre-emptive language, Congress' intent
> to supersede state law altogether may be inferred be-
> cause '[t]he scheme of federal regulation may be so per-
> vasive as to make reasonable the inference that Congress
> left no room for the States to supplement it,' because
> 'the Act of Congress may touch a field in which the fed-
> eral interest is so dominant that the federal system will
> be assumed to preclude enforcement of state laws on the
> same subject,' or because 'the object sought to be ob-
> tained by federal law and the character of obligations im-
> posed by it may reveal the same purpose.' [Citation.]
>
> Even where Congress has not completely displaced
> state regulation in a specific area, state law is nullified to
> the extent that it actually conflicts with federal law. Such
> a conflict arises when 'compliance with both federal and
> state regulations is a physical impossibility,' [citation] or

when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' ***." (*Fidelity Federal Savings & Loan Association v. de la Cuesta* (1982), 458 U.S. 141, 153, 73 L. Ed. 2d 664, 675, 102 S. Ct. 3014, 3022.)

Further guidance was given by the Supreme Court in the same case when it stipulated that Federal regulations have the same preemptive effect as Federal statutes subject to "judicial review only to determine whether [the administrator] has exceeded his statutory authority or acted arbitrarily." 458 U.S. at 154, 73 L. Ed. 2d at 675, 102 S. Ct. at 3022.

With these standards of review in mind, we turn now to an analysis of the Commissioner's contentions that the imposition of the nonreciprocal license fee is not preempted by the provisions of the International Banking Act and the National Bank Act. The Commissioner rests his contention primarily on the theory that the regulations promulgated by the Comptroller contravene the express language of the statute. In support, he undertakes a review of the statute's vocabulary as well as a grammatical review of portions of the Federal statute. While vocabulary and grammar rules may provide clues to the intent of Congress, we believe that in this case the Commissioner has "missed the forest for the trees."

Prior to enactment of the International Banking Act, regulation of foreign-chartered institutions was left entirely in the hands of the individual States. As early as 1966, the Federal legislature undertook a review of the State regulation of the foreign-chartered banks system; however, it was not until 1978 that a bill was passed which sought to establish a "rational framework of Federal regulation." 1978 Senate Report at 2.

Our review of the Senate report indicates that the legislature was fully cognizant of the dual banking system which had previously left regulation of foreign

banks entirely in the hands of the individual States and that, through the International Banking Act, Congress intended to establish a Federal option for foreign-chartered banks that had not previously been available. A major goal of the legislation was to create a "competitive equality between domestic and foreign banks." (1978 Senate Report at 8.) The policy underlying adoption of this bill was the establishment of a system of "national treatment" of foreign banks as well as a system for procuring national treatment for our banks abroad. (1978 Senate Report at 9.) The authors of the Senate report recognize the dual interests of the State and Federal governments when they state that "section 5 *** equitably reconciles the interests and concerns of Federal and State officials, and domestic and foreign banks." (1978 Senate Report at 10.) Section 5 will "preserve and enhance the ability of the States to attract foreign capital and develop international banking centers, and give the United States some leverage to secure more equitable national treatment for U.S. banks abroad." 1978 Senate Report at 10.

Against this backdrop of congressional intent, we look to the language of the International Banking Act and then the National Bank Act. Section 4(a) of the International Banking Act (12 U.S.C. §3102(a) (1982)) establishes that the Comptroller has the authority to license a foreign bank to operate a branch or agency in a State in which it does not already have a State branch or agency and where establishment of a branch or agency is not prohibited by State law. Section 5(a) (12 U.S.C. §3103(a) (1982)), previously set out, delineates limitations on interstate banking by foreign banks. Under section 5(a)(1)(A), a Federal branch may only be operated outside its home State when "its operation is expressly permitted by the State in which it is to be operated." (12 U.S.C. §3103(a)(1)(A) (1982).) The Com-

missioner concedes that section 4(a) permits a State only to *prohibit* the establishment of a branch or agency; a State may impose no other limitations or regulations under this section. However, the Commissioner argues that section 5 presents an entirely different matter because of such words as "expressly" and "its operation." (See statute previously set out.) Under the Commissioner's interpretation, a limited Federal branch would be subject to State regulations that cannot be imposed on a Federal branch or agency. The Commissioner would have this court interpret section 5(a)(1)(A) to mean that individual States would be entitled to pass on the application of each and every bank which wished to operate a limited Federal branch within the borders of that particular State on a basis which could not be made applicable to a Federal branch or agency. This argument defies logic. Nowhere within the legislative history are we able to discern that Congress had such a bifurcated purpose in mind when passing this legislation; instead, the legislative history clearly presents Congress' intent to establish a *national* posture towards all foreign-chartered banks which choose to operate under the Federal system. It is this "national posture" which is supported by the Comptroller through the regulations set out previously in this opinion. To uphold the imposition of the nonreciprocal license fee on limited Federal branches while at the same time noting that such a fee could not be charged to a foreign-chartered bank which operated a Federal branch or a Federal agency would be illogical; moreover, it would frustrate the very purposes and objectives of Congress (see *Hines v. Davidowitz* (1941), 312 U.S. 52, 85 L. Ed. 581, 61 S. Ct. 399), and this we decline to do.

Section 4(b) provides that "a Federal branch or agency *** shall be subject to all the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the National Bank Act to a na-

tional bank ***." (12 U.S.C. §3102(b) (1982).) Therefore, the provisions in section 548 of the National Bank Act regarding State taxation of national banks are applicable to the foreign-chartered banks. The Commissioner's argument that the nonreciprocal license fee does not fall within the enumerated categories of "duties, restrictions, penalties, liabilities, conditions, and limitations" is not persuasive. Under our dual banking system, an institution cannot be both a Federal and a State bank. Therefore, only one entity is entitled to license each bank. What the State legislature has euphemistically labeled a "license fee" is, in reality, more in the nature of a tax or a fine.

Specifically, section 548 provides that "[f]or the purposes of any tax law enacted under authority of the United States or any State, a national bank shall be treated as a bank organized and existing under the laws of the State or other jurisdiction within which its principal office is located." (12 U.S.C. §548 (1982).) Putting the two statutory sections together, we note that a foreign-chartered bank operating under Federal regulations cannot be taxed any differently than a State-chartered bank. Additionally, we could not find any provisions, nor did the Commissioner point out any statutory provisions, which indicated that State banks are subjected to such a "fee." By whatever label it is given, collection of such funds is unlawful.

For the above reasons, we affirm the circuit court of Cook County and declare the nonreciprocal license fee invalid and section 3 of the Act unconstitutional as violative of the supremacy clause.

*Judgment affirmed.*