No. 2--05--0492                                            filed: 9/6/06

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE VILLAGE OF MUNDELEIN, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 05--OV--276 |
| | ) | |
| WISCONSIN CENTRAL RAILROAD, | ) | Honorable |
| | ) | Raymond D. Collins, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the opinion of the court:

Following a bench trial, defendant, Wisconsin Central Railroad, was found guilty of violating an ordinance enacted by plaintiff, the Village of Mundelein (the Village), prohibiting the obstruction of a highway at a railroad grade crossing. The trial court fined defendant $14,000 plus costs. Defendant timely appeals, contending that the Village's enforcement and application of its ordinance is preempted by the Federal Railroad Safety Authorization Act of 1994 (the FRSA) (49 U.S.C. § 20101 et seq. (2000 & Supp. II 2002)). For the reasons that follow, we reverse the trial court's judgment and vacate the fine.

Section 10.20.010 of the Village's municipal code adopts by reference the provisions of the Illinois Vehicle Code (the Vehicle Code) (625 ILCS 5/1--100 et seq. (West 2004)) as its vehicle code. See Mundelein Municipal Code §10.20.010 (1989). As it pertains here, the obstruction of a highway at a grade crossing by a train is addressed in chapter 18c of the Vehicle Code, titled the Illinois Commercial Transportation Law (the Transportation Law) (625 ILCS

5/18c--1101 et seq. (West 2004)).  Section 18c--7402(1)(b) of the Transportation Law (625 ILCS

5/18c--7402(1)(b) (West 2004)), titled "Safety Requirements for Railroad Operations," provides

in pertinent part as follows:

"It is unlawful for a rail carrier to permit any train, railroad car or engine to

obstruct public travel at a railroad-highway grade crossing for a period in excess of 10

minutes, except where such train or railroad car is continuously moving or cannot be

moved by reason of circumstances over which the rail carrier has no reasonable control.

*** Under no circumstances will a moving train be stopped for the purposes of

issuing a citation related to this Section."  625 ILCS 5/18c--7402(1)(b) (West 2004).

The record reflects that on January 17, 2005, defendant was issued a citation for violating

the Village's ordinance by blocking the highway grade crossing at Hawley Street in the Village

for 157 minutes.  On March 31, 2005, defendant filed an offer of proof in support of its argument

that it was not guilty.  In its offer of proof, defendant argued that it did not violate the ordinance,

because the train was stopped at the crossing for reasons beyond its reasonable control.

Defendant also argued that enforcement of the Village's ordinance was preempted by the ICC

Termination Act of 1995 (the ICCTA) (49 U.S.C. §10101 et seq. (2000)) and by the FRSA (49

U.S.C. §20101 et seq. (2000 & Supp. II 2002)).  On April 6, 2005, the Village filed its response

to defendant's offer of proof, and on April 22, 2005, the trial court conducted a bench trial.

The parties stipulated that defendant's train blocked the crossing for the duration of time

indicated in the citation.  Defendant proceeded with the testimony of Bernard Kareka, the

conductor of defendant's train.  Kareka's testimony reflected that, on January 17, 2005, he was

operating defendant's train through the Village.  The train consisted of 3 locomotive engines and

119 cars and had been stopped in Lake Villa for approximately three to four hours prior to

Kareka and an engineer's arrival. The crew that was to bring the train through the Village consisted of Kareka and the engineer. The crew had boarded the train earlier in the morning at Lake Villa, where the train had been secured by the previous crew. Kareka testified that, when he boarded the train at Lake Villa, the previous crew had left a note on the train, indicating that they had problems with the air brakes on the train. Kareka testified that the previous conductor had also fixed a couple of air leaks on the train and changed the gaskets between the air hoses.

Kareka's testimony further reflected that he looked over the first head cars of the train to locate hand brakes, and the engineer looked over the locomotives. The crew then conducted a job briefing, reviewed paperwork, and made sure any cars containing hazardous material were properly placed in the train. The crew also conducted an air brake test called a "set and release test" and verified that the air pressure on the rear of the train was within 15 pounds of the pressure on the front of the train. Kareka explained that federal regulations require verification that brakes are in operating order when an engineer boards a locomotive. He further explained that, as a crew taking over a train already en route, they were not required to perform any tests beyond what they did nor were they required to conduct an inspection of the entire length of the train.

The train departed Lake Villa and headed south toward the Village. As the train was approaching the Village, the crew received an indication from a "hot box" detector that there was dragging equipment on the rear car of the train. In accordance with defendant's operating procedures, the engineer began to slow the train, intending to stop the train and investigate. At that point, though, the train experienced a sudden loss of air pressure, which caused the emergency brakes to apply on each car on the train. The crew tried to restore air pressure, but

the end-of-train indicator showed that the air brake system pressure on the rear of the train would not come up.

Kareka departed the lead locomotive and began walking the length of the train to inspect the train. During his inspection, Kareka discovered that an angle cock was out of position on a car approximately five or six cars forward from the 76th car. He explained that an angle cock is a valve that regulates the flow of air through the train's brake line in each car. Kareka opined that the problem with the angle cock could have been caused by sabotage, by debris that may have knocked the valve out of position while the train was in motion, or by vibration. Kareka further opined that, when the engineer applied a minimum amount of brake pressure when the train began to pass through the Village, it was possible that the brakes applied in the front portion of the train but, due to the angle cock being out of position, not in the rear portion of the train. The effect would have been that the rear portion ran into the front portion. Kareka straightened the angle cock on the car.

When Kareka reached the 76th car of the train, he discovered that a "drawbar," a connecting bar between train cars, had failed and fallen off on the rear end of the 76th car. Kareka testified that a drawbar breaking would cause an emergency brake application. He also noticed that, when the drawbar broke off, it fell under the next couple of cars in the train, damaging the hose on the following car. Kareka testified that the train had broken into two sections. Kareka testified that the crew had no reason to think that the air pressure would not be working once the air test performed that morning in Lake Villa had been successful.

Upon assessing the damage, the crew situated the rear of the train just north of Dunbar Road in the Village and brought the rest of the train, including the car with the failed drawbar, south to set out and leave the defective car on a spur track. They then reversed the train, and the

engineer shoved it back to reconnect with the rear part still sitting north of Dunbar Road.  During this time, no crossings were obstructed.

Next, the crew began the process of tying the train back together and conducting required brake tests so that the train could proceed to Schiller Park.  With the train reconnected, the crew checked the brake system air pressure, but the brake pressure on the rear of the train was not restored to an acceptable level required for departure.  Again, Kareka inspected the train, checking for leaks in the air brake system.  A crew on another train on an adjoining track assisted in inspecting the train and looking for leaks.  During this inspection, the train was blocking Hawley Street in the Village.  The crew ultimately cut the train, or broke it apart, twice to allow passengers on and off a Metra train at the Village's train station.  Upon cutting the train, the forward portion had proper air pressure.  When the train was cut the second time, the railroad dispatcher directed the crew to take the forward portion to Schiller Park.  Another train came by, and its crew tied up and took the remaining portion to Schiller Park.

Following the arguments of the parties, the trial court found that the enforcement of the Village's ordinance was not preempted by federal law and regulations.  The trial court further found that the circumstances resulting in the blockage of the grade crossing were within defendant's reasonable control.  The trial court found that, if the crew had conducted a visual inspection of the train prior to leaving Lake Villa, they may have discovered the angle cock being out of position.  The trial court also noted that the train had been idle for several hours before the new crew took it over in Lake Villa, that there was a report of issues with the air brakes, and that no visual inspection was conducted.  The trial court believed that such an inspection could have identified the problem, which the trial court concluded was a circumstance

within defendant's control. In finding defendant guilty of violating the ordinance, the trial court fined defendant $14,000 plus costs. Defendant timely appeals.

The contentions that defendant raises on appeal are (1) that enforcement of the Village's ordinance is preempted by the FRSA (49 U.S.C. §20101 et seq. (2000 & Supp. II 2002)), and (2) that the trial court, in finding that defendant should have conducted additional investigation of the train prior to its departure from Lake Villa, imposed additional duties of inspection and investigation on defendant in an area of law that is preempted by the FRSA. Defendant argues that court decisions and the express provisions of the FRSA establish the FRSA's preemptive effect on state statutes and local ordinances. Defendant concludes that it was entitled to judgment in its favor because the Village's ordinance was unenforceable.

Federal preemption of municipal ordinances is governed by the same standards that apply to federal preemption of state law. See Wisconsin Public Intervenor v. Mortier, 501 U.S. 597, 605, 115 L. Ed. 2d 532, 543, 111 S. Ct. 2476, 2482 (1991). Pursuant to the supremacy clause of the United States Constitution (U.S. Const., art. VI, cl. 2), Congress has the authority to preempt state law. English v. General Electric Co., 496 U.S. 72, 78-79, 110 L. Ed. 2d 65, 74-75, 110 S. Ct. 2270, 2275 (1990). Three ways exist in which federal law may preempt state law: (1) when the language of the federal statute expressly preempts state law; (2) when the scope of the statute indicates that Congress intended federal law to occupy the field exclusively; or (3) when state law is in actual conflict with federal law. Sprietsma v. Mercury Marine, 537 U.S. 51, 64, 154 L. Ed. 2d 466, 478-79, 123 S. Ct. 518, 527 (2002). In determining whether Congress has preempted state law, this court examines congressional intent. Van Der Molen v. Washington Mutual Finance, Inc., 359 Ill. App. 3d 813, 818 (2005). This examination begins with the assumption that Congress did not intend to displace state law. Van Der Molen, 359 Ill. App. 3d

at 818, citing Maryland v. Louisiana, 451 U.S. 725, 746, 68 L. Ed. 2d 576, 595, 101 S. Ct. 2114, 2129 (1981). When preemption is invoked to prevent a state or municipality from wielding its traditional police powers, congressional intent to displace that authority must be "clear and manifest." See Mortier, 501 U.S. at 605, 115 L. Ed. 2d at 543, 111 S. Ct. at 2482. Whether a federal enactment preempts a state statute or, in this case, a municipal ordinance that adopts a state statute, is a question of law, subject to de novo review. See Van Der Molen, 359 Ill. App. 3d at 818.

Although defendant presented an argument to the trial court that enforcement of the Village's ordinance is preempted by the ICCTA, it did not pursue the argument at the appellate level. We note that at least one federal appeals court has construed the ICCTA and concluded that it expressly preempted state and local laws. See Friberg v. Kansas City Southern Ry. Co., 267 F.3d 439, 443-44 (5th Cir. 2001) (explaining that regulating the time a train may occupy a rail crossing impacts the way a railroad operates its trains regarding such areas as train speed, length, and scheduling). We must also note, though, that a reviewing court in this state recently determined that the ICCTA did not preempt the state statute on which the Village's ordinance was based. See Eagle Marine Industries, Inc. v. Union Pacific R.R. Co., 363 Ill. App. 3d 1166, 1180-82 (5th Dist. 2006). In any event, because defendant did not present an argument to this court based on the Friberg analysis or holding, we decline to consider whether the ICCTA preempts the enforcement of the Village's ordinance. See Dineen v. City of Chicago, 125 Ill. 2d 248, 266 (1988). Accordingly, we will proceed with our consideration of whether the FRSA preempts the Village's ordinance.

Enacted in 1970, the FRSA contemplated a comprehensive and uniform set of safety regulations in all areas of railroad operations. Chicago Transit Authority v. Flohr, 570 F.2d

1305, 1308-09 (7th Cir. 1977). The FRSA's purpose is to "promote safety in every area of railroad operations and [to] reduce railroad-related accidents and incidents." 49 U.S.C. §20101 (2000); CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 661, 123 L. Ed. 2d 387, 395, 113 S. Ct. 1732, 1736 (1993). The FRSA specifically directs the Secretary of Transportation to study and develop solutions to safety problems posed by grade crossings. 49 U.S.C. §20102 (2000); Easterwood, 507 U.S. at 661-62, 123 L. Ed. 2d at 395, 113 S. Ct. at 1736. The FRSA authorizes the Secretary of Transportation to promulgate rules, regulations, and standards for every area of railroad safety. 49 U.S.C. §20103(a) (Supp. II 2002); Easterwood, 507 U.S. at 662, 123 L. Ed. 2d at 395, 113 S. Ct. at 1736.

Section 20106 of the FRSA governs the preemptive effect of these regulations, containing express savings and preemption clauses, and provides as follows:

"Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order--

(1) is necessary to eliminate or reduce an essentially local safety or security hazard;

(2) is not incompatible with a law, regulation, or order of the United States Government; and

(3) does not unreasonably burden interstate commerce."  49 U.S.C. §20106 (Supp. II 2002).

Therefore, in the present case, we must first consider whether the Village's ordinance is "related to" railroad safety, i.e., whether section 20106 of the FRSA applies.  If the Village's ordinance does relate to railroad safety, then we must consider whether the Secretary of Transportation or the Secretary of Homeland Security has issued orders or regulations "covering" the same subject matter as the Village's ordinance pertaining to the operation of trains at grade crossings, i.e., whether there is preemption under section 20106 of the FRSA.  If either of these federal agencies has issued orders or regulations "covering" the subject matter of the Village's ordinance, then we must next consider whether the ordinance meets the three requirements under section 20106 so as to be exempted from preemption.

The Village generally asserts that the ordinance does not relate to railroad safety but serves only to "facilitate the orderly flow of vehicular traffic throughout the Village."  In Easterwood, the Court noted that the phrase "relating to" railroad safety is given a broad interpretation.  Easterwood, 507 U.S. at 664, 123 L. Ed. 2d at 397, 113 S. Ct. at 1738, citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383-84, 119 L. Ed. 2d 157, 167-68, 112 S. Ct. 2031, 2037 (1992).  A federal statute that expressly calls for preemption of matters "relating to" the subject matter of that statute preempts "actions having a connection with or reference to" that subject matter.  Morales, 504 U.S. at 384, 119 L. Ed. 2d at 167, 112 S. Ct. at 2037.  Therefore, in determining whether the Village's ordinance "relates to" railroad safety, we must determine whether there is the requisite "connection with or reference to" railroad safety.  See

Morales, 504 U.S. at 384, 119 L. Ed. 2d at 167, 112 S. Ct. at 2037; see also CSX Transportation, Inc. v. City of Plymouth, Michigan, 86 F.3d 626, 629 (1996).

In the present case, the Village adopted the provisions of the Illinois Vehicle Code as its vehicle code. See Mundelein Municipal Code §10.20.010 (1989). The ordinance at issue here pertaining to the obstruction of a highway by a train at a grade crossing is codified in the section of the Transportation Law that deals with regulations of railroads, that is, section 18c--7402(1)(b) of the Transportation Law, titled "Safety Requirements for Railroad Operations." See 625 ILCS 5/18c--7402(1)(b) (West 2004). Therefore, on its face, the title of the Village's ordinance clearly makes "reference to" railroad safety. See Morales, 504 U.S. at 384, 119 L. Ed. 2d at 167, 112 S. Ct. at 2037. The plain language of the ordinance makes clear that the ordinance is directed at rail carriers and applies only to trains, railroad cars, and engines and not to any other vehicle or entity that may cause an obstruction at a crossing--it applies only to railroads. Because the plain language of the Village's ordinance establishes the requisite "connection with or reference to" railroad safety (see Morales, 504 U.S. at 384, 119 L. Ed. 2d at 167, 112 S. Ct. at 2037), the provisions of the Village's ordinance fall within the scope of section 20106 of the FRSA.

We next consider whether the Secretary of Transportation or the Secretary of Homeland Security has issued orders or regulations "covering" the same subject matter as the Village's ordinance pertaining to the operation of trains at grade crossings, i.e., whether there is preemption under section 20106 of the FRSA. In the present case, defendant, as the party seeking preemption, must establish more than that the federal orders or regulations "touch upon" or "relate to" railroad safety. See Easterwood, 507 U.S. at 664, 123 L. Ed. 2d at 397, 113 S. Ct. at 1738. Section 20106 of the FRSA provides that "[l]aws, regulations, and orders related to

railroad safety shall be nationally uniform to the extent possible."  49 U.S.C. §20106 (Supp. II 2002).  Therefore, in determining whether the provisions of the FRSA preempt the Village's ordinance, we must consider whether federal orders or regulations have been issued "covering" the subject matter, that is, "substantially subsum[ing] the subject matter of the relevant state law."  Easterwood, 507 U.S. at 664, 123 L. Ed. 2d at 397, 113 S. Ct. at 1738.  It is not necessary for the federal regulation to be identical for preemption to apply.  Easterwood, 507 U.S. at 675, 123 L. Ed. 2d at 403-04, 113 S. Ct. at 1743.

In Easterwood, 507 U.S. 658, 123 L. Ed. 2d 387, 113 S. Ct. 1732, the United States Supreme Court reviewed whether the FRSA preempted certain claims for negligence.  The plaintiff brought a wrongful-death action against a railroad company, following the death of her spouse.  The plaintiff alleged, inter alia, that the railroad company was negligent under Georgia law for failing to maintain adequate warning devices at the crossing and for operating its train at an excessive speed.  The Supreme Court held that, under the FRSA, federal regulations adopted by the Secretary of Transportation preempted the plaintiff's negligence action only insofar as it asserted that the railroad company's train was traveling at an excessive speed.  Easterwood, 507 U.S. at 675, 123 L. Ed. 2d at 404, 113 S. Ct. at 1743.  In so holding, the Supreme Court explained that, although the federal regulations addressed only the maximum speeds at which trains were permitted to travel given the nature of the tracks on which they operate, the overall structure of the Secretary's regulations demonstrated that the speed limits were adopted with safety concerns in mind and should be understood as "covering the subject matter" in question. Easterwood, 507 U.S. at 674-75, 123 L. Ed. 2d at 402-03, 113 S. Ct. at 1742-43.  Therefore, even though no particular regulation addressed state regulation of train speed, the Easterwood Court

found preemption through a series of related regulations. Easterwood, 507 U.S. at 675, 123 L. Ed. 2d at 403-04, 113 S. Ct. at 1743.

In the present case, defendant argues that the FRSA preempts enforcement of the Village's ordinance and that the savings clause providing exceptions to preemption in section 20106 does not apply. Defendant asserts that the Secretary of Transportation has issued a number of regulations that substantially subsume the subject matter that the Village's ordinance covers and lists the following: (1) regulations concerning when and how a railroad may transport defective rail cars (49 C.F.R. §232.15 (2005)); (2) regulations directing that an emergency brake application shall occur when there is a rupture in the brake system (49 C.F.R. §232.103 (2005)); (3) regulations concerning air brake testing after a rupture in brake pipe continuity (49 C.F.R. §232.211 (2005)); and (4) regulations concerning what tests and inspections are required when a new train crew takes over a train that is already in transit between terminals (49 C.F.R. §§232.203, 232.205, 232.215 (2005)). Defendant concludes that enforcement of the Village's ordinance is preempted pursuant to section 20106 of the FRSA because these regulations substantially subsume the subject matter.

In support of its argument, defendant cites CSX Transportation, Inc. v. City of Mitchell, Indiana, 105 F. Supp. 2d 949 (S.D. Ind. 1999), and CSX Transportation, Inc. v. City of Plymouth, Michigan, 283 F.3d 812 (6th Cir. 2002). In Mitchell, the railroad company brought an action against the municipality seeking declaratory and injunctive relief to prevent the municipality's enforcement of a state statute prohibiting trains from occupying railroad crossings for more than 10 minutes. The Indiana statute provided:

"It shall be unlawful for a railroad corporation to permit any train, railroad car or engine to obstruct public travel at a railroad-highway grade crossing for a period in

excess of ten (10) minutes, except where such train, railroad car or engine cannot be

moved by reason of circumstances over which the railroad corporation has no control."

Mitchell, 105 F. Supp. 2d at 951, citing Ind. Code §8-6-7.5-1 (____).

The district court granted summary judgment in favor of the railroad company, holding that

enforcement of the statute was preempted by the FRSA. Mitchell, 105 F. Supp. 2d at 952-53.

The district court found that the city's enforcement of the statute frustrated the railroad

company's compliance with federal regulations governing train speed, train length, and trains in

motion, as well as air brake testing and the use of flagmen. Mitchell, 105 F. Supp. 2d at 952.

In Plymouth, the Sixth Circuit affirmed a district court ruling that Michigan's anti-

blocking statute was preempted by the FRSA and that it also violated the commerce clause of the

United States Constitution (U.S. Const., art. I, §8, cl. 3). Plymouth, 283 F.3d at 814. The

Michigan statute at issue provided:

"A railroad shall not permit a train to obstruct vehicular traffic on a public street

or highway for longer than 5 minutes at any 1 time, except the obstruction shall not be

considered a violation under the following circumstances:

(a) If the train is continuously moving in the same direction at not less

than 10 miles per hour for not longer than 7 minutes.

(b) If the railroad can show that the incident occurred as a result of a

verifiable accident, mechanical failure, or unsafe condition." Plymouth, 283 F.3d

at 817, citing Mich. Comp. Laws Ann. §462.391 (West ____).

The district court had determined that, by limiting the amount of time a moving train could block

a grade crossing, the Michigan statute was effectively regulating a train's speed, length, and

performance of air brake testing. Plymouth, 283 F.3d at 816. On appeal, the Michigan Attorney

General contended that the subject matter of the statute was "the time that trains may block highway traffic." Plymouth, 283 F.3d at 817. The court of appeals was unpersuaded by the Attorney General's position, explaining that "the amount of time a moving train spends at a grade crossing is mathematically a function of the length of the train and the speed at which the train is traveling." Plymouth, 283 F.3d at 817. The court of appeals concluded that the Michigan statute would require the railroad company to modify either the speed at which its trains travel or their length, and would also restrict the railroad company's performance of federally mandated air brake tests. Plymouth, 283 F.3d at 817. The court of appeals determined that, to the extent that the Michigan statute sought to modify the length of trains, the United States Supreme Court had already determined that that type of regulation violated the commerce clause. Plymouth, 283 F.3d at 817. In affirming the district court's ruling, the court of appeals also noted that "numerous" federal regulations covered the speed at which trains may travel and the stops that trains must make to test their air brakes, and thus, the federal regulations " 'substantially subsume the subject matter of the relevant state law.' " Plymouth, 283 F. 3d at 817, quoting Easterwood, 507 U.S. at 664, 123 L. Ed. 2d at 397, 113 S. Ct. at 1738.

In the present case, and as stated above, the Village's ordinance provides as follows:

"It is unlawful for a rail carrier to permit any train, railroad car or engine to obstruct public travel at a railroad-highway grade crossing for a period in excess of 10 minutes, except where such train or railroad car is continuously moving or cannot be moved by reason of circumstances over which the rail carrier has no reasonable control.

*** Under no circumstances will a moving train be stopped for the purposes of issuing a citation related to this Section." Mundelein Municipal Code §10.20.010 (1989), adopting 625 ILCS 5/18c--7402(1)(b) (West 2004).

The Village's ordinance is similar to the Michigan and Indiana statutes to the extent that the subject matter of each pertains to the time that trains may obstruct a grade crossing, thereby blocking vehicular traffic.  Also similar to the Michigan and Indiana statutes is the provided exception to the violation, under which the rail carrier bears the burden to establish that the violation occurred by reason of circumstances beyond its reasonable control, i.e., a verifiable accident, mechanical failure, or an unsafe condition.  Both the Sixth Circuit Court of Appeals and the District Court of the Southern District of Indiana have presented reasonable and logical analyses in determining that federal regulations have been promulgated to cover, inter alia, train speed and length such that the FRSA preempts any other entity's enactment regulating, even indirectly, the subject matter of speed, train length, and the performance of air brake tests.  See Plymouth, 283 F.3d at 816-17; Mitchell, 105 F. Supp. 2d at 952-53.

Despite the similarities, the Village's ordinance is different from the Indiana statute in that the Village's ordinance restricts a train from obstructing the grade crossing for more than 10 minutes if the train stops in the crossing.  Therefore, the question is whether that difference saves the ordinance from preemption.  Our analysis leads us to the conclusion that it does not.  We note that the Secretary of Transportation has promulgated regulations setting maximum train speeds for different classes of track.  See 49 C.F.R. §213.9 (1998); Waymire v. Norfolk & Western Ry. Co., 218 F.3d 773, 776 (7th Cir. 2000).  As we discussed above, in Easterwood, the Supreme Court held that the FRSA preempted a state claim for negligence based on excessive speed.  The Easterwood Court recognized that the federal regulations addressed only maximum speeds at which trains were permitted to travel, but noted that "the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation."  Easterwood, 507 U.S. at 674, 123 L. Ed. 2d at 402-03, 113 S. Ct. at 1742.  The Easterwood Court stated that the

regulations "should be understood as covering the subject matter of train speed with respect to the track conditions, including the conditions posed by grade crossings." Easterwood, 507 U.S. at 675, 123 L. Ed. 2d at 403, 113 S. Ct. at 1743.

In the present case, the Village's ordinance applies to all trains traveling through the Village. The Village's ordinance imposes a condition that is related to a train's speed and length by restricting the train from obstructing a grade crossing for more than 10 minutes if the train stops in the crossing. Enforcement of the Village's ordinance reveals how the ordinance regulates train speed and length. For example, if a train takes more than 10 minutes to pass a grade crossing, then the train must be in continual motion or else it would be in violation of the Village's ordinance. Essentially, the Village's ordinance requires a train to do one of two things when passing a crossing: (1) do not stop, or (2) stop but clear quickly. The question is whether the Village can require both of those things; the answer is that it can require neither. To achieve compliance, the Village's ordinance compels railroad carriers to either adjust the length of their trains, e.g., by having a higher volume of shorter trains, or adjust the speed at which the trains are traveling. Put another way, the regulation here is a regulation of train speed and length, although it applies only when a train stops at a crossing. Because the Village's ordinance regulates train speed and length, and any attempt to regulate train speed and length is preempted by the FRSA, the Village's ordinance is preempted by the FRSA. See Plymouth, 283 F.3d at 816-17; Mitchell, 105 F. Supp. 2d at 952-53.

Moreover, the Village's ordinance facially regulates train speed by including an exception that exempts a train from a violation "where such train or railroad car is continuously moving." Mundelein Municipal Code §10.20.010 (1989), adopting 625 ILCS 5/18c--7402(1)(b) (West 2004). By requiring a train to either clear a grade crossing within 10 minutes or be in

continuous movement, the ordinance regulates the train's speed and its length. It is uncontroverted that "numerous" federal regulations cover the subject matter of speed at which trains may travel, based on the class of track. See 49 C.F.R. §§213.9 (reflecting that a freight train may not exceed 10 miles per hour on a Class 1 track, whereas a passenger train may travel as fast as 90 miles per hour on a Class 5 track); 213.307 (reflecting allowable speeds up to 200 miles per hour); 213.57 (reflecting operating speeds for negotiating a curve) (2005); Plymouth, 283 F.3d at 817. Based on our review of the Village's ordinance and the relevant authorities, we conclude that the Village's ordinance is preempted by the FRSA.

The Supreme Court has held that state regulation of train length also violates the commerce clause. Southern Pacific Co. v. Arizona, 325 U.S. 761, 89 L. Ed. 1915, 65 S. Ct. 1515 (1945). By limiting the amount of time a train may block a grade crossing, the Village's ordinance also restricts the rail carrier's performance of federally mandated air brake tests. See Plymouth, 283 F.3d at 817. Grade crossing safety is another area covered by federal regulations. See 49 C.F.R. §§234.105, 234.106, 234.107 (2005). Because the overall structure of the Secretary's regulations demonstrates that speed limits and grade crossing regulations were adopted with safety concerns in mind, the federal regulations "substantially subsume the subject matter of the relevant state law." Easterwood, 507 U.S. at 664, 123 L. Ed. 2d at 397, 113 S. Ct. at 1738. To the extent that the Village's ordinance regulates train speed and length and the performance of federally mandated air brake tests, and implicates grade crossing safety concerns, it is preempted by the FRSA, because the federal regulations "cover the subject matter." See Easterwood, 507 U.S. at 675, 123 L. Ed. 2d at 403, 113 S. Ct. at 1743; Plymouth, 283 F.3d at 817; Friberg, 267 F.3d at 443; Mitchell, 105 F. Supp. 2d at 952. But see Eagle Marine

Industries, Inc., 363 Ill. App. 3d at 1183 (holding that section 18c--7402(a)(b) of the Vehicle Code was not preempted by the FRSA).

Other courts have concluded likewise in similar circumstances. See Rotter v. Union Pacific R.R. Co., 4 F. Supp. 2d 872, 874 (E.D. Mo. 1998) (holding that the FRSA preempted a municipal ordinance prohibiting a railroad from blocking a crossing for more than five minutes); City of Seattle v. Burlington Northern R.R. Co., 41 P.3d 1169, 1174 (Wash. 2002) (holding that the FRSA preempted city ordinances regulating street blockages for periods over four minutes because they affected "the speed at which trains travel, train length, and trains in physical motion," areas regulated by the FRSA). Our determination that the Village's ordinance is preempted by the FRSA because it attempts to regulate train speed, train length, and grade crossing safety obviates the need for a discussion of whether the ordinance regulates federal air brake testing or the use of flagmen.

In responding to defendant's arguments and authority in support of preemption by the FRSA, the Village states, without any citation to supporting authority:

> "The Mundelein ordinance does not attempt to regulate train speed, train length, switching, or any other operational aspect, of the defendant's trains. The Mundelein ordinance only attempts to keep the Village roads clear of obstructions which affect the ability of emergency vehicles to respond to emergency calls and facilitate the orderly flow of vehicular traffic throughout the Village."

In asserting that the ordinance is not preempted by the FRSA, the Village presents little more than the foregoing conclusory statements of the ordinance's purported purpose. The Village fails to distinguish defendant's authority in any meaningful manner and wholly fails to address the Plymouth and Mitchell courts' analyses. Further, the Village provides no authority whatsoever

in support of its position that the FRSA does not preempt its ordinance. Despite a presumption against federal preemption (Van Der Molen, 359 Ill. App. 3d at 818), without more, we are unpersuaded by the Village's response to defendant's preemption argument.

Having determined that the federal regulations cover the subject matter of the Village's ordinance and that the ordinance is, therefore, preempted by the FRSA, we next consider whether the ordinance can survive under the savings clause of section 20106 of the FRSA. Again, the savings clause provides:

"A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order--

(1) is necessary to eliminate or reduce an essentially local safety or security hazard;

(2) is not incompatible with a law, regulation, or order of the United States Government; and

(3) does not unreasonably burden interstate commerce." 49 U.S.C. §20106 (Supp. II 2002).

Defendant argues that the savings clause does not apply, for two reasons. First, defendant argues that the savings clause does not apply to municipal ordinances but only to state laws or actions. See Plymouth, 86 F.3d at 628-29 (finding that the FRSA's savings clause does not apply to municipal ordinances). Second, defendant argues that the Village's ordinance fails to meet the requirements of the savings clause in that the plain language of the ordinance fails to state that it is addressing a uniquely local safety hazard; the ordinance is incompatible with the federal regulations and procedures in response to a casualty situation; and enforcing the

ordinance would burden interstate commerce by frustrating the FRSA's goals of uniform national safety standards.

We first consider whether the savings clause encompasses municipal ordinances. Our review of the clause is guided by the well-established principles of statutory construction. The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent. Southern Illinoisan v. Illinois Department of Public Health, 218 Ill. 2d 390, 415 (2006), citing People ex rel. Sherman v. Cryns, 203 Ill. 2d 264, 279 (2003). The most reliable indication of that intent is the statutory language itself. Southern Illinoisan, 218 Ill. 2d at 415, citing In re Madison H., 215 Ill. 2d 364, 372 (2005). We must afford the language its plain, ordinary, popularly understood meaning. Cryns, 203 Ill. 2d at 279. When the language is unambiguous, the statute must be applied as written, without resorting to other aids of construction. Lawrence v. Regent Realty Group, Inc., 197 Ill. 2d 1, 10 (2001).

In the present case, the plain language of section 20106 provides that these exceptions apply only to a "State" that "adopt[s] or continue[s] in force an additional or more stringent law, regulation, or order related to railroad safety or security." 49 U.S.C. §20106 (Supp. II 2002). Because the Village is not a "State," the Village's ordinance is not within the FRSA's savings clause exceptions. See Plymouth, 86 F.3d at 628. Other courts have held similarly that the savings clause does not apply to local governments or cover regulation by municipal ordinances. See Donelon v. New Orleans Terminal Co., 474 F.2d 1108 (5th Cir. 1973); CSX Transportation, Inc. v. City of Thorsby, 741 F. Supp. 889, 891 (M.D. Ala. 1990); City of Covington v. Chesapeake & Ohio Ry. Co., 708 F. Supp. 806, 808-09 (E.D. Ky. 1989); CSX Transportation, Inc. v. City of Tullahoma, 705 F. Supp. 385, 387-88 (E.D. Tenn. 1988).

We believe that the text and structure of the savings clause of section 20106 of the FRSA leaves no doubt that a municipality does not constitute a "State" and that the exception does not encompass municipal ordinances. See Michigan Southern R.R. Co. v. City of Kendallville, 251 F.3d 1152 (7th Cir. 2001). Because the Village is not a "State," the Village's ordinance does not fall within the FRSA's savings clause. Accordingly, we need not address the remaining three requirements listed in the savings clause, because these exceptions apply only to states. See Eagle Marine Industries, Inc., 363 Ill. App. 3d 1166 (considering the exceptions in reviewing section 18c--7402(1)(b) of the Vehicle Code).

The supremacy clause of the United States Constitution establishes that, when federal law conflicts with state or local law, the federal law must control. U.S. Const., art. VI, cl. 2; see also Busch v. Graphic Color Corp., 169 Ill. 2d 325, 334 (1996). For the reasons discussed above, we find that the Village's ordinance is preempted by the FRSA and is unenforceable.

Because the Village's ordinance is preempted by the FRSA and is unenforceable, a discussion of whether the trial court correctly applied the ordinance when it found defendant guilty of violating the ordinance is not warranted. See National Commercial Banking Corp. of Australia, Ltd. v. Harris, 125 Ill. 2d 448, 454-55 (1988) (declining to address other issues presented by the parties on appeal because of its decision based on preemption).

For the foregoing reasons, we reverse the judgment of the circuit court of Lake County and vacate the fine.

Reversed; fine vacated.

O'MALLEY and GILLERAN JOHNSON, JJ., concur.